**A.J. FAIGIN, Plaintiff, Appellant,**

v.

**James E. KELLY and Vic Carucci, Defendants, Appellees.**

No. 98–1589.

United States Court of Appeals, First Circuit.

Argued June 11, 1999.

Decided July 19, 1999.

---

A.J. Faigin, pro se ipso, for appellant.

Steven M. Gordon, with whom Lucy J. Karl, Shaheen & Gordon, P.A., and Linda Steinman were on brief, for appellee Kelly.

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

SELYA, Circuit Judge.

This is a tale of an American icon. Jim Kelly attained great celebrity during an illustrious professional football career. By his own admission, however, he did not handle his newfound fame and fortune as well as he handled a pigskin. Looking back, Kelly believed that his adjustment had been retarded by a cluster of agents who put their own financial interests ahead of his.

Eventually, Kelly rid himself of these subalterns and made different arrangements. When he thereafter penned his autobiography, he made no bones about his contempt for his former mentors. One of these advisers, plaintiff-appellant A.J. Faigin, took umbrage and sued both Kelly and Vic Carucci, the journalist who assisted Kelly in writing the book. In due season, the *nisi prius* court granted Carucci's motion for summary judgment, but denied Kelly's parallel motion. Faigin's case against Kelly was tried to a jury over a 19–day span and resulted in a defendant's verdict. Faigin appeals. Deterrating no reversible error, we affirm.

## I. BACKGROUND

We divide our canvass of background events into three segments. First, we sketch the contours of the association between Kelly and Faigin. Next, we discuss the book that Kelly wrote with Carucci's help. Third, we limn the travel of the case.

### A. *The Relationship.*

In 1980, Faigin joined Greg Lustig and Ken Weinberger in forming what they conceived as a "full-service sports management" enterprise. This mini-conglomerate included three separate corporations that collectively offered tax, accounting, financial, and marketing services to professional athletes. Although these entities seemingly overlapped in practice, the founders' game plan was to furnish contract negotiation services through Lustig Pro Sports, Inc. (LPS); to furnish financial and invest-

ment advice through Consultants' Development Group, Inc. (CDG); and to use the third entity, known as Lustig Group (L–Group), as an investment vehicle. Lustig and Faigin also formed a law firm, Lustig & Faigin Co., LPA (L & F), to provide legal representation to athletes and to the three corporations. Faigin had an interest in each of these entities: he had capital invested in LPS and served as its president; he was a shareholder, director, and officer of both CDG and L–Group; and he a was a principal in L & F.

In 1983, Kelly capped a star-studded collegiate career as the quarterback of the University of Miami Hurricanes. Faigin recruited him that spring and Kelly signed contracts with LPS and CDG. Both the National Football League (the NFL) and the United States Football League (the USFL) drafted him in the first round. Kelly opted for the fledgling USFL. LPS negotiated a contract for him with the Houston Gamblers and CDG assembled and managed his investment portfolio. After the USFL folded in 1986, LPS helped Kelly secure a contract with the Buffalo Bills of the NFL—a deal that, at the time, was thought to be the most lucrative in the league's history.

In 1987, Faigin and Lustig came to a rancorous parting of the ways. Faigin sent Kelly an audiotape describing the split and explaining that he no longer could work with Lustig because he feared for his own reputation. In this regard, Faigin noted that Lustig's investment advice and other business decisions were largely self-serving, and that LPS's clients, Kelly included, had been improperly billed. Kelly's investigation into these charges lent him no comfort and, in 1988, he severed his ties with his former agents. A new set of advisers took the helm.

### B. *The Book.*

Carucci agreed to help Kelly write his autobiography, and the tome, entitled "Armed and Dangerous," was published in

1992. For the most part, the account (written in the first-person singular, despite Carucci's collaboration) lumped Faigin, Lustig, and Weinberger together. The passages relating to them were relatively brief. We reprint below· the statements that sparked the instant action:

> The draft began at eight o'clock in the morning. I was in Akron, Ohio, where my agents at the time—Greg Lustig, A.J. Faigin and Ken Weinberger—were based. (I wanted to use another word besides "agents" here, but that's better left for the lawsuit that is currently pending in Texas. My mother always said if you don't have anything good to say about somebody, don't say anything at all.)
>
> . . . . .
>
> I learned my lesson the hard way about whom to trust and whom not to trust in business. I had had complete faith in my first agents, Greg Lustig and A.J. Faigin. . . .
>
> Then Danny and the Trevino brothers started taking a closer look at my business affairs. And the more they looked, the more they didn't like what they found.
>
> Finally, I saw the light. In 1988, I fired Lustig and Faigin and put my brother [Danny] and the Trevinos in charge of all my business dealings. Then I filed a major lawsuit against my former agents, as well as the former owners of the Gamblers for defaulting on the payment of my signing bonus.
>
> Fortunately, I was able to catch the problem before it was too late, which made me luckier than a lot of other pro athletes. When you come out of college, you're so trusting, so vulnerable when it comes to finding people to handle your money. I'm just glad that I had a brother and a couple of close friends who cared enough to slap me upside the head and get my attention.
>
> The funny thing is, my mother never liked Lustig from Day One. There was something about him that told her he couldn't be trusted.
>
> I should have followed Mom's intuition.

Jim Kelly and Vic Carucci, *Armed and Dangerous* 57, 159–60 (1992).

### C. *Travel of the Case.*

Invoking diversity jurisdiction, 28 U.S.C. § 1332(a), Faigin initiated a libel action against Kelly and Carucci in New Hampshire's federal district court.[1] Extensive pretrial discovery ensued. In the course of the proceedings, the district court, for reasons to which we shall return, granted summary judgment in Carucci's favor.

Faigin's case against Kelly was tried to a jury. The court permitted Kelly and Faigin to argue competing views of the gist of the disputed passages. For his part, Kelly maintained both that his comments were not defamatory (but indicated merely that he had "lost trust in his agents generally") and that they were true. Faigin disagreed. He argued that the statements falsely implied that he was dismissed for unlawful conduct, thus damaging his reputation and jeopardizing his career. The court submitted the case on special interrogatories. *See* Fed.R.Civ.P. 49(a). In response to the first question, the jury concluded that the relevant passages contained defamatory statements, i.e. implications of fact that tended to harm Faigin's reputation.

The second question went to the statements' objective truth. It read: "Based

---

1. None of the parties had any obvious connection to New Hampshire. Withal, Kelly's autobiography had been circulated to a national audience, and Faigin—who did not institute suit until 1995—apparently selected the forum to take advantage of New Hampshire's generous statute of limitations (previously six years, now three years). *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778–80, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (holding that New Hampshire could apply its statute of limitations to a libel suit brought by a nonresident plaintiff against a publisher-defendant who had "minimum contacts" with the State).

on a preponderance of the evidence, do you find that the defamatory statements or implications of fact in the defendant's book were false?" The jury found that Faigin had failed to prove falsity and, pursuant to the court's instructions, returned a take-nothing verdict.

This appeal followed. Faigin, who was represented by experienced counsel below, proceeds pro se in this court. He assigns error to a plethora of rulings. Many of his arguments so clearly lack persuasive force that we reject them out of hand. In this opinion, we examine only the residuum of Faigin's asseverational array.

## II. ANALYSIS

We start our trek through the issues by scrutinizing the summary judgment ruling. Moving to the trial, we next consider Faigin's sufficiency-of-the-evidence challenge and his insistence that the district court improperly declined to apply collateral estoppel to his behoof. We then survey a number of evidentiary issues and proceed from there to ponder an alleged discovery violation and the lower court's denial of Faigin's request to mount a rebuttal. We conclude by addressing the jury instructions.

### A. *The Entry of Summary Judgment.*

Faigin asserts that the trial court erred in granting Carucci an exit visa under the aegis of Fed.R.Civ.P. 56. *See, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48–49 (1st Cir.1990) (explicating summary judgment standard). We explain briefly why we regard this assertion as moot.

 In this diversity case, New Hampshire law supplies the substantive rules of decision. *See Fitzgerald v. Expressway Sewerage Constr., Inc.*, 177 F.3d 71, 74 (1st Cir.1999); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir. 1996). To prove defamation under New Hampshire law, a plaintiff ordinarily must establish that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." *Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 138 N.H. 110, 635 A.2d 487, 492 (N.H.1993), *citing* Restatement (Second) of Torts § 558 (1977). A statement is defamatory if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). Consequently, a libel plaintiff customarily bears the burden of proving that the defendant (1) lacked due care (2) in publishing a false statement of fact (3) which was defamatory in nature.

 Most rules admit of exceptions, and this rule is no different. The Supreme Court has made it pellucid that the First Amendment demands that a defamation plaintiff who is a "public figure" must show more than mere negligence.[2] *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Rather, as a condition precedent to recovery, such a plaintiff must prove by clear and convincing evidence that the defendant published the defamatory statement with actual malice, that is, that the defendant knew that the statement was false or, at least, recklessly disregarded its want of veracity. *See Masson*, 501 U.S. at 510, 111 S.Ct. 2419; *Pendleton v. City of Haverhill*, 156 F.3d 57, 65 (1st Cir.1998).

---

2. The case law describes two generic types of public figures: general-purpose public figures (that is, individuals who "achieve such pervasive fame or notoriety" as to become public figures "for all purposes and in all contexts"), and limited-purpose public figures (that is, individuals who voluntarily inject themselves or are sucked into particular public controversies, and thereby become public figures "for a limited range of issues"). *Gertz v. Welch*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *accord Pendleton v. City of Haverhill*, 156 F.3d 57, 67 (1st Cir.1998).

■ In this case, the district court concluded that Faigin was a limited-purpose public figure. *See Faigin v. Kelly*, 978 F.Supp. 420, 428 (D.N.H.1997).[3] This meant that Faigin had the responsibility of proving actual malice in order to recover for defamation. *See id.* at 428–29. Because Faigin had adduced no evidence that Carucci (who functioned principally as a scrivener) either knew that the challenged statements were false or recklessly disregarded their truthfulness, *see id.* at 429, the district court granted Carucci's motion for *brevis* disposition.[4]

In this venue, Faigin maintains that the trial court erred in characterizing him as a limited-purpose public figure. The argument that he presents is substantial, and the answer to the question is not free from doubt. In the last analysis, however, we have no occasion to probe the point.

At trial, the jury found specially that Faigin did not prove that the allegedly defamatory statements were false. Objective falsity is not only an element of a defamation action, but also is logically antecedent to questions bearing upon negligence or state of mind. Thus, this special finding, which we conclude was supportable, *see infra* Part II(B), itself sufficed to thwart Faigin's lawsuit and rendered the presence or absence of malice irrelevant. *See* Restatement (Second) of Torts § 581A, comment h (1977) (explaining that "it is immaterial if the person who publishes the statement believes it is false if it turns out to be true"). It follows inexorably that, inasmuch as Faigin's status as a public figure *vel non* bore exclusively on the state-of-mind requirement, the jury's finding on falsity moots the public figure inquiry.[5]

### B. *Sufficiency of the Evidence.*

■ Faigin contends that the evidence adduced at trial was insufficient as a matter of law to sustain the verdict. The principal problem with this contention is that Faigin neglected to make a motion for judgment as a matter of law at the close of all the evidence. *See* Fed.R.Civ.P. 50(a). He then compounded his lapse by abjuring any motion for judgment notwithstanding the verdict. *See* Fed.R.Civ.P. 50(b). When a litigant has foregone a timely motion for judgment as a matter of law, the court of appeals normally will not consider the legal sufficiency of the evidence. *See Hammond v. T.J. Litle & Co.*, 82 F.3d 1166, 1171 (1st Cir.1996); *La Amiga del Pueblo, Inc. v. Robles*, 937 F.2d 689, 691 (1st Cir.1991); *Jusino v. Zayas*, 875 F.2d 986, 991 (1st Cir.1989).

■ We say "normally" because, even in the absence of such a motion, the court of appeals retains a modicum of residual discretion to inquire whether the record reflects an absolute dearth of evidentiary support for the jury's verdict. *See La Amiga del Pueblo*, 937 F.2d at 691. Here, however, such an inquiry quickly reveals that the evidence is not so lopsided as to

3. In the same opinion, the district court rejected the defendants' assertion that the challenged statements were statements of opinion insulated by the First Amendment. *See Faigin*, 978 F.Supp. at 425. We regard the question as close (at least as to the majority of the statements). *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127–28 (1st Cir.1997). Be that as it may, Kelly has not argued this theory on appeal and we take no position on it.

4. The court's published opinion contained all the reasoning needed for this grant of summary judgment, but, through an oversight, did not actually allow Carucci's motion. When apprised of this omission, the court promptly entered an emendatory order that clarified the situation. *See Faigin v. Kelly*, No. 95–317–SD (D.N.H. Oct. 7, 1997) (order amending *Faigin v. Kelly*, 978 F.Supp. 420 (D.N.H. 1997)).

5. Faigin also argues that the district court's slant on this issue improperly increased his burden of proof vis-à-vis Kelly. Again, however, the increased burden related exclusively to the defendant's state of mind. Thus, the same logic inoculates us against any need to address this asserted error.

bring this seldom-invoked discretion into play. To the contrary, the evidence that contradicts Faigin's claim of objective falsity seems more than ample.

We add a coda. To the extent that Faigin contends that the verdict was against the weight of the evidence, his failure to file a motion for new trial, *see* Fed.R.Civ.P. 59(a), ensnares him in the toils of a similar—and equally lethal—procedural default. *See La Amiga del Pueblo,* 937 F.2d at 691 (explaining that if the verdict-loser has not made a timely motion for a new trial, "the court of appeals will not thereafter review the weight of the evidence undergirding the adverse verdict").

### C. *Collateral Estoppel.*

■ Faigin complains bitterly about the district court's refusal to give preclusive effect to a sanctions order issued in the aftermath of previous litigation between the protagonists. We set the stage.

In 1989, Kelly sued Lustig, Faigin, Weinberger, and numerous others in the United States District Court for the Southern District of Texas. As it pertained to Faigin, the complaint alleged in substance that he had played an active role in misleading Kelly about certain investments. Kelly settled some claims against some defendants and dropped other defendants because of their penury.

In 1994, under pressure to comply with long-overdue discovery requests, he voluntarily dismissed his claims against Faigin without prejudice. Faigin then moved for sanctions, claiming that Kelly had knowingly brought and maintained a groundless case against him without performing the investigation required under Fed.R.Civ.P. 11.[6] The Texas court found that Kelly had

adduced no evidence to show that Faigin was involved in the investment decisions that formed the centerpiece of the litigation; determined that Kelly knew (or should have known) that his allegations against Faigin were therefore frivolous; and ordered Kelly to pay $11,000 in sanctions. *See Kelly v. Lustig,* No. H–89–1931, slip op. (S.D.Tex. Aug. 12, 1994) (the Sanctions Order).

After he had initiated the instant case, Faigin asked the district court to treat the Sanctions Order as conclusive evidence that Kelly knew the statements made in *Armed and Dangerous* were false vis-à-vis Faigin. The court denied Faigin's motion in limine and rejected similar importunings during the trial. Faigin protests.

Fundamentally, this claim of error suffers from the same infirmity as Faigin's "public figure" argument. *See supra* Part II(A). The jury found that Faigin had failed to prove that the challenged passages were false—and Faigin did not claim below (nor does he claim on appeal) that the Sanctions Order should have been given preclusive effect on the issue of objective falsity. Thus, technically, Faigin's collateral estoppel argument—which went only to the issue of Kelly's state of mind—was rendered moot by the jury's special finding on the logically antecedent issue of falsity.

Despite this conclusion, we deem it advisable to treat the collateral estoppel issue on the merits. We do so because Faigin also assails the district court's refusal to admit the Sanctions Order into evidence *at all. See infra* Part II(D). That claim is far from moot (as Faigin argues, *inter alia,* that the Sanctions Order, though not preemptive, constitutes a salient piece of evidence on the issue of objective falsity), and our resolution of this

---

**6.** The rule provides in relevant part that all claims asserted in a federal court action must be "warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and that a party's "allegations and other factual contentions

[must] have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b). Sanctions are an appropriate remedy for violations of these aspirational standards. *See* Fed.R.Civ.P. 11(c).

evidentiary ruling is necessarily informed by a determination of whether the trial court erred in its assessment of the collateral estoppel initiative. Hence, we inquire into the court's decision not to give the Sanctions Order preclusive effect. Since applications of the collateral estoppel doctrine primarily present questions of law, we afford de novo review. *See Keystone Shipping Co. v. New England Power Co.,* 109 F.3d 46, 50 (1st Cir.1997).

When a party implores a federal court to give preclusive effect to a prior federal court adjudication, federal law governs. *See Massachusetts School of Law v. ABA,* 142 F.3d 26, 37 (1st Cir. 1998); *Johnson v. SCA Disposal Services of New England, Inc.,* 931 F.2d 970, 974 (1st Cir.1991). Faigin argues here for issue preclusion as opposed to claim preclusion. *See, e.g., Fiumara v. Fireman's Fund Ins. Cos.,* 746 F.2d 87, 90 n. 1 (1st Cir.1984) (remarking the separate existence of the two distinct, but closely related, doctrines). Under federal common law, a party seeking to estop the litigation of an issue by reference to a previous adjudication between the parties must establish (1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order). *See Grella v. Salem Five Cent Savings Bank,* 42 F.3d 26, 30 (1st Cir.1994); *NLRB v. Donna–Lee Sportswear Co.,* 836 F.2d 31, 34 (1st Cir.1987); *see also* Restatement (Second) of Judgments § 27 (1982). Faigin's proffer cannot

clear either the first or second of these hurdles.

It is common ground that the reach of collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." *C.I.R. v. Sunnen,* 333 U.S. 591, 599–600, 68 S.Ct. 715, 92 L.Ed. 898 (1948). The issue addressed and resolved by the Sanctions Order was whether Kelly had abused the judicial process in failing to produce evidence to substantiate claims that he had made regarding Faigin's supposed involvement in shady investment activities. By contrast, the issue below was the truthfulness *vel non* of the remarks contained in Kelly's autobiography. The latter implicated Kelly's overall relationship with his agents and dealt with a much broader spectrum of business practices. Moreover, while the narrower charges leveled by Kelly in the Texas case overlapped to some modest extent with the matters at issue in the instant case,[7] the mere presence of a modicum of factual commonality does not establish the requisite identity of issues for purposes of collateral estoppel. *See id.* at 601, 68 S.Ct. 715. Rather, the issues must be defined by reference to the judicial determinations at stake. *See id.* at 600, 68 S.Ct. 715.

Given the *Sunnen* standard, there is simply too loose a fit to warrant a collateral estoppel here. At issue in the Rule 11 proceedings was Kelly's litigation conduct; at issue below was the truth of the factual implications contained in the book. Because the issues are not the same, the district court correctly refused to give the Sanctions Order preclusive effect. *See Thomas v. Contoocook Valley Sch. Dist.,* 150 F.3d 31, 41 (1st Cir.1998) (rejecting collateral estoppel due to a lack of issue identicality).

---

7. Although Faigin might have argued that the Sanctions Order deserved preclusive effect as to the narrower set of allegations actually asserted in the Texas case, he made no such argument to the district court. The point, therefore, has been waived.

■ There is a second, equally compelling basis for rebuffing the collateral estoppel idea. The scope of a Rule 11 hearing is generally much more circumscribed than that of a trial or comparable proceeding. Thus, there are legitimate questions as to whether a Rule 11 sanctions order can provide a satisfactory basis for issue preclusion under any circumstances in respect to the merits of a complaint. *See Amwest Mortgage Corp. v. Grady*, 925 F.2d 1162, 1165 (9th Cir.1991); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (warning that "[e]ven if a district court indicated that a complaint was not legally tenable or factually well-founded for Rule 11 purposes, the resulting Rule 11 sanction would nevertheless not preclude the refiling of a complaint"). By their very nature, Rule 11 inquiries are severely restricted, *see* Fed.R.Civ.P. 11 advisory committee notes (explaining that "the court must to the extent possible limit the scope of sanction proceedings to the record"), and it seems odd to extrapolate from them to the subsequent litigation of issues on the merits.

Whether or not findings made in a Rule 11 proceeding can *ever* be given collateral estoppel effect as to the merits of a complaint at a subsequent trial—a matter that we leave for another day—the Sanctions Order upon which Faigin relies misses the mark. Faigin brought his Rule 11 motion based on Kelly's ostensible failure adequately to investigate the facts and the law prior to filing the Texas civil action. *See* Fed.R.Civ.P. 11(b)(2)-(3). The Texas court had no obligation to conduct a searching inquiry into the truth or falsity of Kelly's allegations, and it did not do so. Rather, the court concerned itself solely with whether Kelly had made the prefiling investigation that Rule 11 demands—and it did so on a record essentially devoid of discovery. While we do not question the propriety of the sanction—the fact that Kelly had maintained an action against Faigin for five years without ever producing evidence in support of his claims appears inexcusable—we discern no sufficient indicia that the issues which are determinative here actually were litigated in the Rule 11 proceeding.

We need not paint the lily. Either of the reasons we have stated is independently sufficient to justify the district court's refusal to apply principles of collateral estoppel in this situation. Together, they are insurmountable.

### D. *Admissibility of the Sanctions Order.*

■ Apart from collateral estoppel on the issue of knowledge, Faigin sought to introduce the Sanctions Order into evidence as probative on the issue of falsity. Kelly countered by invoking Fed.R.Evid. 403 and moving in limine to bar any reference to the Sanctions Order for this purpose.[8] The court proceeded cautiously. It took Kelly's motion under advisement, alerting the parties that it needed a more complete picture of the evidence in order adequately to assess the question of admissibility. *See United States v. Holmquist*, 36 F.3d 154, 163 (1st Cir.1994) (endorsing such an approach). The court indicated that it would perform the requisite balancing when the issue surfaced in a better-defined context.

■ On several occasions during the trial, Faigin attempted to introduce the Sanctions Order (or evidence about it). Each time, the district court rejected the proffer. Faigin condemns the exclusion of this evidence. We test the trial court's rulings on claims of error related to the admission or exclusion of evidence for abuse of discretion. *See Williams v.*

---

8. Fed.R.Evid. 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Drake,* 146 F.3d 44, 47 (1st Cir.1998); *Blinzler,* 81 F.3d at 1158.

Under Rule 403, the trier must balance probative worth against unfairly prejudicial effect. We accord district courts considerable latitude in this exercise. Trials are highly nuanced affairs, and we are mindful that the trial judge—unlike an appellate panel—can hear the gunfire, observe the maneuvering, and smell the smoke of battle as the case plays out before the jury.

In this instance, the disputed evidence had some probative value. Kelly and Faigin argued competing views of the gist of the challenged statements, and the findings in the Sanctions Order tend to corroborate Faigin's claim that these passages contained false implications of fact. But the probative value of these findings was not great. As previously noted, the issues addressed in the two fora varied significantly. For example, in support of his "substantial truth" defense, Kelly produced evidence below of improper overbilling, fiduciary failings related to his USFL contract, a gossamer insurance policy, a fraudulent assignment, and questionable tax advice involving the backdating of checks. None of these items had surfaced in the Texas litigation, and, therefore, the Sanctions Order had scant probative value as to the accuracy of those allegations.

To be sure, a subset of overlapping allegations existed. As to these issues, the Texas court's frivolousness finding had some limited value. Still, the matter had not been fully litigated and the finding stemmed from an undeveloped record. *See supra* Part II(C). Moreover, the finding was made pursuant to a legal standard very different from objective falsity. *See id.* The finding therefore carried diminished probative value even as to the overlapping issues.

Looking at the other pan of the scales, the district court had solid reasons for concern about the untoward effects of the proffered evidence. A lay jury is quite likely to give special weight to judicial findings merely because they are judicial findings. *See Nipper v. Snipes,* 7 F.3d 415, 418 (4th Cir.1993) (explaining that "judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury") (internal quotations marks omitted). Consequently, courts, recognizing the attendant danger of jury confusion and unfair prejudice, frequently have approved the exclusion of judicial findings, convictions, and similar evidence on Rule 403 grounds. *See, e.g., Gil–De–Rebollo v. Miami Heat Associations, Inc.,* 137 F.3d 56, 64 (1st Cir.1998) (upholding decision to exclude evidence of a criminal misdemeanor conviction in a related civil trial); *Nipper,* 7 F.3d at 418 (upholding exclusion of court order in related civil case); *cf. Williams,* 146 F.3d at 47 (affirming, in a related civil suit, exclusion of guilty plea previously entered by plaintiff before prison disciplinary board). We are extremely reluctant to second-guess the district court's battlefield determination that the scenario at hand presented a worrisome potential for such mischief.

Our task on appeal is not to conduct afresh the balancing that Rule 403 requires. Instead, we review the record to determine whether the trial court's calibration of the probative value/unfair prejudice scales falls within the range of acceptable outcomes. Our review indicates that the court below held the balance steady and true: it excluded the Sanctions Order but permitted Faigin to show Kelly's course of conduct in the prior litigation and to argue to the jury that this behavior demonstrated his bad faith (or worse).[9] Rule 403

9. Under this framework, the court allowed Faigin to adduce virtually everything related to the prior litigation except the Sanctions Order itself. Thus, Faigin succeeded in intro-

ducing much of the same evidence that the Texas court relied on in imposing sanctions, e.g., that Kelly had testified that Faigin was involved mostly with the "contract negotia-

controversies by their very nature present competing considerations, and compromise is often the best solution for a particularly knotty Rule 403 problem. *See, e.g., Williams,* 146 F.3d at 47 (deeming it important that the court excluded only the guilty plea, not evidence of the prior disciplinary proceedings in gross). We think that the district court's charting of such a course made good sense in the idiosyncratic circumstances of this case.

In the end, the standard of review carries the day. We have said with a regularity bordering on the monotonous that "[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1340 (1st Cir.1988). This case, in which the district court maximized the evidence available to the jury while simultaneously minimizing the potential for confusion and unfair prejudice, comes within the *Freeman* rule. Because no "extraordinarily compelling circumstances" counsel to the contrary, we hold that the lower court did not abuse its discretion in excluding Faigin's proffer of the Sanctions Order.

### E. *Other Evidentiary Points.*

Faigin offers a salmagundi of other tidbits relating to the admission and/or exclusion of evidence. We comment briefly on each of these contentions. The benchmark for our review remains abuse of discretion. *See Williams,* 146 F.3d at 47; *Blinzler,* 81 F.3d at 1158.

■ **1. *Vicarious Liability.*** Faigin unsuccessfully moved in limine to prohibit Kelly from introducing evidence on what Faigin characterizes (somewhat inaccurately, in our view) as a theory of "vicarious liability." He now protests the district court's denial of his motion, maintaining

that the charged defamation was "personal" and that Kelly should not have been allowed to shift the focus from Faigin as an individual by presenting evidence of Faigin's partners' skullduggery (a practice that Faigin, in phraseology that sheds more heat than light, calls "guilt by association"). This argument lacks force.

At trial, Kelly maintained that his statements about Faigin connoted nothing more than an overall loss of trust in his former agents. In support of that theory, he sought to depict a mosaic of misconduct allegedly perpetrated by LPS, CDG, L-Group, and their representatives (like Lustig). Considering Faigin's ties to this contingent and his fiduciary responsibilities as an attorney, a principal, and a corporate officer, this evidence possessed palpable relevancy. *See* Fed.R.Evid. 401, 402. The evidence also possessed relevancy as a means of painting the backdrop against which Kelly's affairs were handled and his book written. We view it as well-settled that "context" evidence generally is admissible, *see, e.g., United States v. McKeeve,* 131 F.3d 1, 13–14 (1st Cir.1997), and there is no warrant for applying some other, more restrictive rule here. The district court thus acted within the bounds of its discretion in permitting Kelly to introduce evidence of the dubious practices in which his advisers engaged, whether or not Faigin personally committed them.

■ **2. *Judicial Estoppel.*** Faigin also suggests that this same evidence should have been barred under the doctrine of judicial estoppel. His refrain goes something like this: in the Texas litigation, Kelly claimed that the corporations were Lustig's alter egos, and, therefore, Kelly should have been prohibited from asserting in this case that Faigin played a meaningful role in their operation. We disagree.

tion" side of the business, that Kelly had refused to respond to Faigin's legitimate discovery requests in the Texas proceeding, and

that, when ordered to reply, Kelly dropped the suit.

 Under certain circumstances, the doctrine of judicial estoppel precludes "parties in civil litigation from asserting legal or factual positions inconsistent with the positions that they took in prior proceedings." *United States v. Velez Carrero,* 140 F.3d 327, 330 (1st Cir.1998). To invoke the doctrine, the proponent must show that the party to be estopped had "succeeded previously with a position directly inconsistent with the one [he] currently espouses." *Lydon v. Boston Sand & Gravel Co.,* 175 F.3d 6, 13 (1st Cir.1999). Passing the obvious fact that the positions taken by Kelly in the two cases are hardly susceptible to characterization as "directly inconsistent," Faigin made no showing that Kelly succeeded in establishing his earlier position. To the contrary, Kelly eventually dropped the veil-piercing claims that he had asserted against Lustig and the myriad corporate entities. Hence, Faigin lacks any plausible basis for a claim of judicial estoppel.

 3. *Kickback Evidence.* Land, Sea & Air Development Corporation (LS & A) owned certain area rights to a restaurant franchise. In 1984, it contracted with L–Group to have the latter "package, syndicate, and secure all necessary funding" for these franchises. In return, LS & A agreed to remunerate L–Group by paying commissions and making other scheduled payments as particular franchise locations were developed.

Kelly asserted at trial that his agents steered clients' funds into certain of these franchises without advising the clients of L–Group's arrangement with LS & A. He asked the district court to admit into evidence the memorandum of understanding (MOU) entered into between LS & A and L–Group as part of his effort to show that L–Group's financial interest in these projects had not been fully disclosed in the offering materials that the agents presented to clients (Kelly included). The district court admitted the MOU over Faigin's objection.

On appeal, Faigin contends that admitting the evidence and allowing Kelly to refer to it as evidence of a "kickback" scheme created unfair prejudice. *See* Fed. R.Evid. 403. We reject this contention. Faigin, an officer and director of L–Group, was privy to the MOU—indeed, he had subscribed his name as a witness to Lustig's execution of it—and the document, when taken in conjunction with other properly admitted materials, constituted relevant evidence of a blatant conflict of interest.

 To be sure, the evidence was prejudicial in the sense that it hurt Faigin's chances of prevailing at trial. But that kind of prejudice·is not a basis for judicial exclusion of probative evidence. All evidence introduced by a party is designed to be prejudicial—to help his case, or to harm his opponent's case, or both. Thus, "[t]he fact that a piece of evidence hurts a party's chances does not mean it should automatically be excluded. If that were true, there would be precious little left in the way of probative evidence in any case." *Onujiogu v. United States,* 817 F.2d 3, 6 (1st Cir.1987). The question is one of *unfair* prejudice—and we see none here.

 Faigin's complaint about the characterization of the MOU as evidence of a "kickback" rather than a "sales commission" is unavailing. He never specifically objected below to the use of the word, and, thus, has forfeited the point. *See Campos–Orrego v. Rivera,* 175 F.3d 89, 95 (1st Cir.1999); *Teamsters, Chauffeurs, Warehousemen and Helpers Union v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992). Of course, we still could intervene to correct plain error, forfeiture notwithstanding—but plain error is plainly absent in this instance. Although the word "kickback" is pejorative, trials are flesh-and-blood affairs. Courts routinely grant lawyers and litigants some margin for rhetorical flourishes. *See generally Wagenmann v. Adams,* 829 F.2d 196, 217 (1st Cir.1987) ("Our judicial system is not so impractical as to demand that the last drop of juice be

squeezed from evidence before a jury can consider it."). Here, the court permitted the parties to explore the MOU's ramifications and characterize it as they preferred, leaving the jury to decide whether the arrangement more closely resembled a straightforward sales commission or something less savory. While calling the arrangement a kickback was strong medicine (and perhaps better left unsaid), it strains credulity to suggest, in the absence of a specific objection, that the use of the word caused justice to miscarry. *See Campos–Orrego*, 175 F.3d at 95 (finding "no patent injustice . . . in holding the appellant[ ] to the readily foreseeable consequences of [his] own trial tactics," and, accordingly, finding no plain error).

▆▆▆▆ **4.** *Former Clients.* During the trial, the district court permitted four former clients of LPS to testify. Faigin contends generally that this evidence was erroneously admitted. However, he failed to make sufficiently specific contemporaneous objections when the witnesses were called to testify, thus negating the contention that he seeks to advance here.[10] *See United States v. Saccoccia*, 58 F.3d 754, 780 (1st Cir.1995); *see also* Fed.R.Evid. 103(a).

▆▆▆▆ Relatedly, Faigin complains about the introduction of evidence of other lawsuits brought by former clients against Lustig, LPS, CDG, and/or L–Group. While we doubt that this complaint has been properly preserved, we do not doubt that it—like the claim related to the testimony of the former clients—is meritless. Testimony by other athletes regarding their difficulties with Faigin and his associates went directly to the truth of the disputed statements contained in Kelly's autobiography. Similarly, evidence of other lawsuits—whether or not they named

Faigin as a defendant—was probative to impeach Faigin's claimed ignorance of any corporate misconduct. Then, too, much of this evidence was relevant to damages, specifically, the state of Faigin's reputation prior to the publication of *Armed and Dangerous. See Bularz v. Prudential Ins. Co.*, 93 F.3d 372, 378–79 (7th Cir.1996) (finding evidence of complaints by other customers relevant both to the truth of the allegedly defamatory statement and to the pre-publication state of the plaintiff's reputation).

To say more on this front would be supererogatory. Bearing in mind that "[a] trial is a search for truth and cannot sensibly take place in a vacuum," *Real v. Hogan*, 828 F.2d 58, 62 (1st Cir.1987), we reject the entire alphabet of evidentiary error that Faigin marshals.

**F.** *The Alleged Discovery Violation.*

▆▆▆ Faigin propounded interrogatories concerning Kelly's investments over a 13–year span. Kelly inventoried his investments, but was less forthcoming in respect to two ancillary interrogatories. One of these asked him to specify, for each such investment, "the amount of money that the investment has made or lost from the inception to date, and, if sold, identify the date of sale." The other requested (a) that he acknowledge, in regard to each poor performer, "whether [he] received a tax deduction for the loss," and (b) that he confirm "the total sum of [all such] tax deductions." When compelled to answer these two interrogatories, Kelly replied that "[t]he financial data required to respond . . . is not readily available." He then referred Faigin to particular financial schedules and statements previously produced and represented that these "statements reflect the value of [Kelly's] holdings as of the dates thereof." Finally, he

---

**10.** Faigin did move to strike the entire testimony of Steve DeOssie, a former client—but he offered no specific grounds in support of that motion. He thereby forfeited any argument that he otherwise might have had. *See* Fed.R.Evid. 103(a). At any rate, an after-the-

fact motion to strike usually does not repair the forfeiture that flows from the failure to interpose a contemporaneous objection. *See McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir.1994).

explained that, because of a confidentiality agreement imposed by an arbitrator, he could not furnish information with regard to investments that he had made through Shearson Lehman Brothers. Faigin made no further effort to compel more particularized answers to these two interrogatories.

At trial, Faigin labored to exclude evidence that numerous investments arranged for Kelly by CDG and L–Group proved worthless. To support this entreaty, Faigin cited the incompleteness of Kelly's answers to the two ancillary interrogatories and asked the district court to invoke its powers under Fed.R.Civ.P. 37(b)(2).[11] The court refused to rule out the evidence of investment losses and Kelly introduced it. Faigin assigns error.

A district court's case-management powers apply with particular force to the regulation of discovery and the reconciliation of discovery disputes. See Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 692 (1st Cir.1994); Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir.1989); In re Recticel Foam Corp., 859 F.2d 1000, 1006 (1st Cir.1988). The standard of review in discovery matters is not appellant-friendly. The court of appeals "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Mack, 871 F.2d at 186.

In this instance, the trial court heard arguments as to whether the interrogatory answers complied with the order compelling further responses. Ultimately, the court ruled in Kelly's favor, implicitly determining (as had been argued) that Kelly had substantially complied with the order and that in all events Faigin had accumulated sufficient information to contest the claimed losses. Having carefully reviewed the record, we deem this two-part ruling supportable.

We start with two general propositions of indisputable validity. First, the question whether a party adequately has complied with a court order is a matter peculiarly within the ken of the judge who issued the order. See De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 120 n. 3 (1st Cir.1991) ("A district court, after all, is in the best position to determine whether a party's filings are sufficient to comply with the court's own order."); Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1066–67 (1st Cir.1987) (similar). Second, answering interrogatories is more a matter of art than of science. Thus, the sufficiency of an answer to an interrogatory frequently depends on the surrounding circumstances.

Proceeding from the general to the specific, we deem it especially important here that, in the course of protracted pretrial discovery, Faigin received voluminous documentary evidence concerning Kelly's finances (e.g., tax returns, financial statements, and balance sheets). Parties sometimes can answer interrogatories satisfactorily by reference to information previously produced, see, e.g., Fed.R.Civ.P. 33(d), and the district court apparently thought that this was so in the instant case. Given the differing institutional competencies of trial and appellate tribunals, we decline to play Monday-morning quarterback and substitute our collective judgement for that of the district court. See Mack, 871 F.2d at 187 (upholding the denial of motion to compel further answers to interrogatories and noting that "above all, the trier must be accorded considerable latitude in gauging the extent of

11. Rule 37(b)(2) provides in relevant part:

If a party ... fails to obey an order to provide ... discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ... (B) An order ... prohibiting [the disobedient] party from introducing designated matters into evidence.

a party's compliance" with discovery requests); *see also id.* ("Sticking the appellate nose too readily into the district court's scope-of-discovery tent is ... a recipe for disaster.").

█ If we had substantial doubts about this question—and we do not—they would be quelled by Faigin's failure to request a continuance. Faigin claims to have been ambushed by the evidence of some $800,-000 in investment losses. However, the most efficacious remedy for litigatory surprise is to seek a continuance at the time the surprise emerges. *See Jom, Inc. v. Adell Plastics, Inc.*, No. 97–2131, 1999 WL 773536, at *13 n.2 (1st Cir. Oct. 4, 1999)(En Banc)(Per Curiam); *Szeliga v. General Motors Corp.*, 728 F.2d 566, 568 (1st Cir. 1984); *see also United States v. Diaz–Villafane*, 874 F.2d 43, 47 (1st Cir.1989) (suggesting that if a party is confronted by unfair surprise, a continuance usually provides "a complete cure"). If a party eschews such a course, and then seeks to complain about unfair surprise after he receives an unfavorable judgment or verdict, "his neglect to ask the district court for a continuance to meet the claimed exigency" undercuts his complaint. *Diaz–Villafane*, 874 F.2d at 47. In such circumstances, a reviewing court may attribute special significance to the party's eschewal of a continuance and assume that the party did not require additional time to adjust his litigation strategy. *See United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993).

This case fits within that taxonomy. Faigin does not explain in any detail what portions of Kelly's loss computations were not fully calculable from the materials already in his possession. This fact, coupled with the failure to seek a continuance, disarms the complaint of unfair surprise. *See In re United States*, 158 F.3d 26, 32 n. 3 (1st Cir.1998).

## G. *The Denial of Rebuttal.*

█ Faigin faults the district court for refusing to allow him to present rebuttal testimony. The principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case. *See La Esperanza De P.R., Inc. v. Perez Y Cia De Puerto Rico, Inc.*, 124 F.3d 10, 20 n. 6 (1st Cir.1997); *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 47 (1st Cir.1991). The decision to allow or foreclose rebuttal evidence rests squarely within the informed discretion of the district court. *See United States v. LiCausi*, 167 F.3d 36, 52 (1st Cir.1999); *see also* Fed.R.Evid. 611(a) (confirming the trial judge's authority over the order of proof).

█ Here, Faigin wanted rebuttal for two purposes. First, he wished to rebut the claim that Kelly had suffered investment losses of roughly $800,000. *See supra* Part II(F). He proposed to do so by eliciting testimony from an accounting expert that the investments had yielded substantial tax benefits (which offset, at least to some extent, their lack of economic success). This proffer was too late. Faigin had the burden of proving that Kelly's statements were false. He knew that the statements' truthfulness depended, at least in part, on the quality of the investments. He also knew through pretrial discovery that this aspect of the case would be hotly contested. Indeed, Faigin called Kelly during his case in chief and inquired pointedly about the investment losses. Faigin likewise pursued his "tax benefit" theory during his case in chief. Thus, Faigin had enough notice of the dimensions of the battlefield that he could—and should— have brought in his heavy artillery and called his expert prior to resting. He did not do so.

█ In this setting, the district court did not abuse its discretion in denying rebuttal. When a party knows that a contested matter is in the case, yet fails to address it in a timely fashion, he scarcely can be heard to complain that the trial court refused to give him a second nibble at the cherry. *See Lubanski*, 929 F.2d at 47 (upholding the denial of rebuttal when the proffered rebuttal evidence was avail-

able to the plaintiff during her case in chief and the testimony she sought to rebut was not unexpected). This principle has particular bite where, as here, nothing new or unanticipated surfaced during the defense case that even arguably changed the topography of the battlefield.

Faigin's other basis for rebuttal is of a different stripe. He says that he desired to take the stand to rebut the testimony of Ron Springs, a former client, and that the court erred in not allowing rebuttal for this limited purpose. Because this plaint possesses a patina of plausibility, we recount the relevant circumstances.

Springs testified at the trial by way of a videotaped deposition. In anticipation of Kelly's introduction of this evidence, Faigin's counsel sought to have Faigin testify during his case in chief about inconsistent statements made by Springs. The court sustained Kelly's objection on the ground that Springs' testimony had not yet been received. At the same time, however, the court told Faigin that he would be allowed to delve into those statements on rebuttal.

After the defense rested (presenting, *inter alia*, Springs' deposition testimony), Faigin's counsel asked that Faigin be permitted to take the stand "for ten minutes" in rebuttal and referred obliquely to the court's earlier commitment.[12] The court denied the request on the ground that, since Faigin had testified for eight days, the testimony likely would be repetitive. Faigin neither made an offer of proof at that point nor identified the particular statements that he wished to impeach.

We conclude that Faigin's failure to make an appropriate offer of proof eviscerates his claim. *See* Fed.R.Evid. 103(a)(2) (dictating that an assignment of error may not be predicated upon a ruling that excludes evidence unless, *inter alia*, "the substance of the evidence was made

known to the court by offer or was apparent from the context within which questions were asked"). After all, "[i]t is a bedrock rule of trial practice that, to preserve for appellate review a claim of error premised on the exclusion of evidence, the aggrieved party must ensure that the record sufficiently reflects the content of the proposed evidence." *Williams*, 146 F.3d at 49. In this case, when the defense rested and Faigin's counsel sought permission to call Faigin in rebuttal, the court asked how he intended to rebut Kelly's witnesses. The lawyer merely restated the question: "I'd like him to rebut the charges made by those players in [Kelly's] case." This falls several leagues short of identifying the substance of the proposed evidence. *See Earle v. Benoit*, 850 F.2d 836, 848 (1st Cir.1988). Since Faigin flouted a "bedrock rule," he must endure the penalty.

Faigin attempts an end run around this seemingly inevitable conclusion. While admitting that he did not make a contemporaneous offer of proof, he says that his attorney adequately informed the court of the substance of the proposed rebuttal more than three weeks earlier, when he prematurely sought to have his client testify about Springs' statements. Leaving the time lag to one side, the record belies this claim. It shows that Faigin's lawyer mentioned the possibility of prior inconsistent statements at that time, but did not elaborate in any way on the nature of the purported inconsistencies. Vague generalizations are insufficient to effect compliance with Rule 103(a)(2). *See James v. Bell Helicopter Co.*, 715 F.2d 166, 175 (5th Cir.1983).

## H. *Jury Instructions.*

Finally, Faigin strives to persuade us that the trial court's jury instructions were thrice deficient. The rules of

---

12. Under ordinary circumstances, we might more readily hold the court to its original promise of rebuttal, even though that promise, of necessity, was tentative when made. Here, however, the circumstances are out of the ordinary, for the court's commitment was vitiated by Faigin's failure to make an offer of proof. *See* text *infra*.

decision are uncontroversial. "The trial court's refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *Elliott v. S.D. Warren Co.*, 134 F.3d 1, 6 (1st Cir.1998) (quoting *United States v. DeStefano*, 59 F.3d 1, 2 (1st Cir.1995)). Similarly, the giving of an instruction is reversible error only if it (1) was misleading, unduly complicating, or incorrect as a matter of law, and (2) adversely affected the objecting party's substantial rights. *See Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 135 (1st Cir.1997). Applying these tenets, we discern no error.

 First and foremost, we deem Faigin's challenge procedurally defaulted. A party cannot assign error to an aspect of the judge's jury instructions unless that particular claim of error has been noted by means of a contemporaneous objection given at the appointed time (i.e., at the end of the charge, but before the jury retires to deliberate). *See Campos–Orrego*, 175 F.3d at 98; *see also* Fed.R.Civ.P. 51. When put to his mettle, it is the appellant's burden to establish that he has preserved such a claim of error and, relatedly, to furnish the court of appeals with so much of the record of the proceedings below as is necessary to enable informed appellate review. *See Campos–Orrego*, 175 F.3d at 93; *Moore v. Murphy*, 47 F.3d 8, 10 (1st Cir. 1995); *see also* Fed. R.App. P. 10. When an appellant dances around these responsibilities, he must pay the piper.

This is such a case. Faigin failed to supply a transcript of the Rule 51 sidebar conference. This omission obstructs our view of what transpired below. We cannot tell what specific objections, if any, were presented to the district court, whether they were timely, or how the court responded. Faigin's failure to supply us with the raw material that would illuminate these points supports a presumption

that none of his challenges to the jury instructions were properly preserved.

We hasten to add that, even if Faigin's assaults on the charge were appropriately before us, they would fail. His initial lament relates to the court's failure to instruct the jury that defamation is a personal and individual claim. Faigin presents no independent argumentation in support of this attack, but, rather, links it to his assertion that the court erred in admitting evidence of what he terms "vicarious liability." Because that assertion lacks force, *see supra* Part II(E)(1), the linked claim of instructional error collapses of its own weight.

Faigin's next grievance pertains to an instruction given by the court on the roles and duties of corporate officers, directors, and attorneys. He does not criticize the contents of the instruction, but contends that the law of fiduciary duties was immaterial in this case. Because this claim hinges on his unsuccessful challenge to the admission of "vicarious liability" evidence and on his rejected "judicial estoppel" argument, *see supra* Part II(E)(2), it, too, collapses.

██ Faigin's final remonstrance concerns the trial court's decision not to give an instruction on presumed damages. But the jury never reached the question of damages. Hence, any error in this regard necessarily was harmless.

## III. CONCLUSION

We need go no further. In law, as in football, the number of passes attempted means less than the record of passes completed and touchdowns scored. Here, Faigin's passing attack, though prolific, lacks accuracy, and, in all events, never crosses the goal line. For aught that appears, Faigin lost a hotly-contested game played with scrupulous attention to the rules under the watchful eyes of an attentive referee. Because we descry no trace

of significant legal error, the district court's judgment will be

*Affirmed.*