# United States Court of Appeals

## For the First Circuit

No. 04-2285

JASON SURPRENANT,

Plaintiff, Appellee,

v.

CESAR RIVAS ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Selya, Dyk,* and Howard,

Circuit Judges.

Elizabeth Hurley, with whom John A. Curran and Getman, Stacey, Schulthess & Steere, PA were on brief, for appellants.
Michael J. Sheehan for appellee.

September 9, 2005

*Of the Federal Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  In this prisoner civil rights action, two correctional officers and the superintendent of a county jail appeal from a jury verdict in favor of a pretrial detainee.  The defendants variously complain that the plaintiff failed to present sufficient evidence to underpin his claims, that the trial court erred in instructing the jury, and that the court botched several evidentiary rulings.  Many of these claims are forfeit and the rest are without merit.  Consequently, we affirm the judgment below.

## I.  BACKGROUND

The Hillsborough County jail houses both pretrial detainees and convicted misdemeanants.  On the evening of July 14, 2002, defendant-appellant Cesar Rivas, a correctional officer, was the sole guard on duty in Unit 2D, a medium security wing of the jail.  At some point during the inmates' out-of-cell time, Rivas radioed an emergency request for assistance by other officers (known in prison parlance as a "10-33") and activated his body alarm.  Responding officers locked down the unit and removed nine inmates identified by Rivas, including plaintiff-appellee Jason Surprenant, to a segregation wing, Unit 2B, familiarly known as "the hole."

While the parties agree to these raw facts, they offer starkly different accounts of what transpired before and after the enumerated events occurred. Rivas claims that immediately prior to

the 10-33 "officer in danger" alert, twenty to twenty-five belligerent inmates, including the plaintiff, mobbed and threatened him.  He sounded the 10-33 because he feared for his safety.  The other defendants, though not present that evening, support Rivas's account.

The plaintiff and his witnesses tell a vastly different tale.  They say that the incident never happened; that Rivas called in the 10-33 without any provocation (at most, two or three inmates were conversing with him in normal tones); and that, at the critical time, the plaintiff was lifting weights with fellow inmates at a different location.  The plaintiff attributes Rivas's trumped-up call to his (Rivas's) antipathy for a clique of inmates who resided in one corner of Unit 2D.  He theorizes that Rivas concocted the apocryphal story in order to have these inmates "lugged to the hole."  The plaintiff admits, however, that he was not a member of the clique and could only speculate as to why Rivas named him as one of the perpetrators.

The verdict indicates that the jurors largely believed the plaintiff's version of events.  Therefore, from this point forward we rehearse the facts in the light most favorable to the verdict.  See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1188 (1st Cir. 1995).

After the lockdown was in effect, the response team removed the plaintiff from Unit 2D and segregated him in Unit 2B.

Inmates in segregation cells were allowed only a mattress, sheet, pillow, and prison uniform. All other items were forbidden, even legal papers, writing instruments, and articles essential to personal hygiene (like soap and toilet paper). Although each cell contained a sink and toilet, the jailers restricted inmates' water usage in order to prevent deliberate flooding. Thus, each cell's water supply was turned off regardless of whether the occupant had ever been involved in a flooding incident. If an inmate needed to flush his toilet, get a drink, or wash his hands, he had to ask a correctional officer to turn on the water momentarily. Frequently, no correctional officer was nearby and, even if one was in the vicinity, the inmate ran the risk that the officer would choose either to ignore his request or to dawdle in fulfilling it.

Those consigned to segregation were placed in one of three classifications: (i) punitive segregation, (ii) administrative segregation, or (iii) awaiting hearing segregation (AH). The plaintiff was a pretrial detainee, awaiting hearing on Rivas's newly lodged accusation, so prison hierarchs classified him as AH. Because of that classification, the plaintiff was subject to all the above-described conditions.

The plaintiff also was made subject to a "three-day rotation." Inmates on three-day rotation were allowed out of their cells only once every three days, in shackles, for a quick shower. They could not make telephone calls, receive mail, or have visitors

(although attorneys, on their own initiative, could see their clients). The plaintiff remained in an AH classification and on a three-day rotation for upwards of three weeks.

To make matters worse, inmates on three-day rotation were subjected to as many as five in-cell strip searches each day. The process required the inmate to manipulate several unclean areas of his body in order to show officers that those areas did not conceal contraband. The inmate then had to place his fingers in his mouth for the same purpose. The evidence indicated that the strip searchers often orchestrated these steps so that an inmate would have to manipulate his armpits, groin, and buttocks before manipulating his cheeks and tongue. Because of the in-cell water restrictions, an inmate ordinarily could not wash his hands prior to such a search. Not infrequently, a strip-searched inmate would have to eat his meals with the same unclean hands.

After reviewing Rivas's incident report, defendant-appellant Teresa Pendleton, a disciplinary officer, charged the plaintiff with participating in an attempt to take Rivas hostage. She scheduled a disciplinary hearing for July 22, 2002. The plaintiff was not given advance written notice of the charges;[1]

---

[1]The defendants dispute this claim. The jury, however, was entitled to resolve conflicting accounts. See United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000) (observing that "credibility determinations are for the jury, not for an appellate court"). The defendants also assert that, in all events, a specification of the charges was left in the plaintiff's mailbox. That assertion conveniently overlooks testimony to the effect that

-5-

until the hearing commenced, he assumed that he had been relegated to the hole for cursing at a correctional officer from his cell during the July 14 lockdown.

When the plaintiff belatedly learned the nature of the charges, he told Pendleton of his alibi (that he was lifting weights elsewhere in the prison) and identified two potential witnesses to his whereabouts. Pendleton chose not to interview the named individuals. In at least one instance, she admitted that she did not do so because she had made up her mind in advance that the putative witness would not tell the truth. She also refused to credit statements of other accused inmates that tended to exonerate the plaintiff. And, finally, when prison officials who were conducting an internal investigation of the incident asked Pendleton to withhold the imposition of any sanctions until they had completed their probe, she nonetheless plunged ahead, found the plaintiff guilty, and imposed sanctions prior to the completion of the internal investigation (and without making the slightest effort to ascertain the status of that investigation).

Pendleton handed down her ukase on August 8, 2002. She based her finding that the plaintiff was guilty of attempting to take Rivas hostage solely on Rivas's report and the testimony of a jailhouse informant who professed to have witnessed the incident.

---

the plaintiff had no access to his mailbox during the relevant time frame.

She credited the latter's testimony even though it was established that his cell had no line of sight to the spot where Rivas claimed that the incident occurred.

As a sanction, Pendleton directed that the plaintiff do a thirty-day stint in punitive segregation. The plaintiff served this term in Unit 2B, albeit reclassified to punitive segregation status.[2] He was not given any credit for time spent in Unit 2B while awaiting the hearing.

In August of 2002, the plaintiff commenced the instant action in the United States District Court for the District of New Hampshire. His handwritten pro se complaint named several defendants including Rivas, Pendleton, and the jail's superintendent, James O'Mara, Jr. (sued in his official capacity). In due course, the plaintiff obtained counsel.

After some procedural skirmishing, not relevant here, the case went to trial on an amended complaint containing six statements of claim. The jury found the defendants liable on three claims brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment, namely, count 1 (which alleged that Rivas punished the plaintiff by making false allegations that led to his immediate segregation), count 4 (which alleged that Pendleton failed to

---

[2]Ironically, the conditions of punitive segregation proved to be less onerous than those attendant to AH status. In any event, the plaintiff does not challenge the conditions of his confinement while in punitive segregation.

afford the plaintiff procedural due process at his disciplinary hearing), and count 6 (which alleged that O'Mara, in his official capacity, was responsible for the unconstitutional conditions of confinement that the plaintiff experienced while on AH status). The jury awarded nominal damages on all three counts and punitive damages against Rivas ($5,500) and Pendleton ($15,000). The jury resolved the other three counts adversely to the plaintiff and those counts are not before us.

The defendants never moved for a new trial. They all moved, however, for judgment notwithstanding the verdict. The district court denied that motion and this timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

The defendants raise a gallimaufry of challenges to the rulings made below. Each defendant mounts a particularized attack on the count on which he or she was found liable. They then join forces to impugn certain evidentiary rulings. For ease in articulation, we address the individual challenges first and then move to the collective challenge.

### A. <u>Count 1: Violation of Due Process by False Allegation (Rivas)</u>.

Rivas offers four reasons why he should have been granted judgment as a matter of law or, in the alternative, a new trial. Three of these go to the heart of the claim asserted against him.

-8-

The fourth goes to the correctness of the district court's jury instructions.  We consider the first three arguments as a group before addressing the fourth.

1.  **The Forfeited Arguments**.  Rivas's first three arguments are intertwined.  His first plaint posits that a correctional officer's filing of a false charge against an inmate, knowing that the making of the charge will lead to an immediate deprivation of rights, does not violate due process and, therefore, fails to state a valid section 1983 claim.  His second plaint takes a related, but slightly less extreme, position:  he suggests that a pretrial detainee's right to be free from such fictionalized charges was not clearly established in 2002 and that, therefore, he was entitled to qualified immunity.  The third plaint suggests, as a fallback, that the plaintiff presented insufficient evidence to sustain the allegations contained in count 1.  None of these arguments was preserved below and, thus, they are forfeited.

Federal Rule of Civil Procedure 50(a) permits a party to move for judgment as a matter of law "at any time before submission of the case to the jury."  The defendants made such a motion at the close of the plaintiff's case in chief and the trial court denied it.  The defendants then proceeded to present evidence.  Where, as here, a defendant moves unsuccessfully for a directed verdict at the close of the plaintiff's case in chief and then proceeds to offer evidence, he waives any right to appeal the court's denial of

the motion. See Lama v. Borras, 16 F.3d 473, 476 n.5 (1st Cir. 1994); Home Ins. Co. v. Davila, 212 F.2d 731, 733 (1st Cir. 1954). In effect, therefore, the court of appeals may review only the denial of a motion for judgment as a matter of law made at the close of all the evidence and seasonably renewed post-verdict. See Cone v. W. Va. Pulp & Paper Co., 330 U.S. 212, 218 (1947); see also Fed. R. Civ. P. 50(b).

The defendants in this case neglected to make a motion for judgment as a matter of law at the close of all the evidence. That failure rendered inutile their post-trial motion for judgment notwithstanding the verdict and precluded ordinary appellate review of the sufficiency of the claim. See Muñiz v. Rovira, 373 F.3d 1, 5 n.2 (1st Cir. 2004) ("Failure to file a motion for judgment as a matter of law at the close of all the evidence pretermits the filing of a post-trial motion for that relief."); Keisling v. Ser-Jobs For Progress, Inc., 19 F.3d 755, 758 (1st Cir. 1994) (similar).

In an effort to detour around this obstacle, Rivas argues that his claim may still be reviewed for plain error. In this context, however, the plain error doctrine has very narrow contours: in the absence of a duly preserved motion for either judgment as a matter of law or a new trial, we may set aside a verdict only to prevent a clear and gross injustice of the sort that would result from enforcing a verdict for which the record

-10-

reveals an absolute dearth of evidentiary support. <u>Faigin</u> v. <u>Kelly</u>, 184 F.3d 67, 76 (1st Cir. 1999); <u>La Amiga del Pueblo, Inc.</u> v. <u>Robles</u>, 937 F.2d 689, 691 (1st Cir. 1991). Rivas cannot slip through this modest escape hatch because the record here is far from empty.

We need not tarry. On the evidence before it, the jury rationally could have found that Rivas prevaricated about the July 14 incident; that because of his animosity toward certain inmates, Rivas intended to punish the men whom he falsely accused; and that Rivas knew that his lie would cause those men to be thrown into the hole immediately. On the last point, no less a personage than Captain Dionne, the prison's chief of security, testified that <u>any</u> correctional officer would have known that an accusation as serious as Rivas's would lead to immediate segregation. No more was exigible to show that, as a matter of proof, the verdict did not work a clear and gross injustice.

Rivas is simply incorrect to suggest that relief is warranted because the plaintiff's theory of the case was bogus. A pretrial detainee has a Fourteenth Amendment right to be free from punishment prior to conviction. <u>See</u> <u>Bell</u> v. <u>Wolfish</u>, 441 U.S. 520, 535 (1979). While a pretrial detainee may be disciplined for a specific institutional infraction committed during the period of his detention, the discipline imposed must be roughly proportionate to the gravity of the infraction. <u>Collazo-Leon</u> v. <u>U.S. Bureau of</u>

<u>Prisons</u>, 51 F.3d 315, 318 (1st Cir. 1995).  An arbitrary, or disproportionate sanction, or one that furthers no legitimate penological objective, constitutes punishment (and, thus, is proscribed by the Fourteenth Amendment).  <u>See</u> <u>Bell</u>, 441 U.S. at 538-39.

Rivas cites <u>Freeman</u> v. <u>Rideout</u>, 808 F.2d 949 (2d Cir. 1986), and <u>Hanrahan</u> v. <u>Lane</u>, 747 F.2d 1137 (7th Cir. 1984) (per curiam), for the proposition that the filing of false charges by a correctional officer does not state a Fourteenth Amendment claim when the accused inmate is given a subsequent hearing on those charges.  These cases, both of which involved convicts and not pretrial detainees, are readily distinguishable.  In each of them, punishment was meted out only after an impartial disciplinary board had determined that the evidence supported a finding that the convict in question had committed the charged infraction.  <u>See</u> <u>Freeman</u>, 808 F.2d at 949; <u>Hanrahan</u>, 747 F.2d at 1140.  The allegedly false testimony itself did not lead directly to punishment.  <u>See</u>, <u>e.g.</u>, <u>Freeman</u>, 808 F.2d at 953 (noting that the convict "suffered as a result of the finding of guilty . . . and not merely because of the filing of unfounded charges").  By contrast, the plaintiff in this case alleges that he suffered punishment as a direct result of Rivas's false accusation, which led to his immediate segregation and the attendant privations for

a period of several weeks before the resolution of the due process hearing.

Rivas counters that the immediate segregation of rebellious inmates furthers the legitimate objective of ensuring security and order within a penitentiary (and, thus, that the plaintiff was not "punished" by the pre-hearing placement). This mischaracterizes the plaintiff's claim. The plaintiff does not contend that the jail wrongfully punished him in advance of the due process hearing, but, rather, that Rivas wrongfully engineered his punishment by fabricating a serious charge knowing that the falsehood would lead to the plaintiff's immediate placement in the hole without any intervening hearing. That kind of unprincipled manipulation of legitimate prison regulations, to the detriment of a pretrial detainee, can constitute arbitrary punishment by a correctional officer, even if the response by other (unwitting) prison officials is legitimate and non-punitive. See, e.g., Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004) ("An intent to punish on the part of detention facility officials is sufficient to show unconstitutional pretrial punishment.").

Our decision in O'Connor v. Huard, 117 F.3d 12 (1st Cir. 1997), is instructive on this point. There, a correctional officer relentlessly taunted a pretrial detainee whom she knew to have an anxiety disorder in order to provoke an outburst. Id. at 15. She knew that such outbursts violated prison rules and inevitably would

-13-

lead to the detainee's placement in administrative segregation. Id. at 15-16. We held that the officer's intent to punish the detainee, coupled with "instigative actions . . . directed toward [that] end," constituted "arbitrary and unreasonable punishment" in violation of the Fourteenth Amendment. Id. at 16. In so holding, we hastened to distinguish between the officer's culpable role and the prison's non-culpable role. See id.

There is no material difference between the theory on which our holding in O'Connor rested and the plaintiff's theory here. A correctional officer cannot punish a pretrial detainee through deliberate manipulation of an unwitting institutional proxy any more than he can do so by brute force.

Rivas's qualified immunity defense also has been forfeited. He did not raise this defense by a pretrial motion to dismiss, Fed. R. Civ. P. 12(b)(6), by a pretrial motion for summary judgment, Fed. R. Civ. P. 56(c), or by a timely motion for judgment as a matter of law, Fed. R. Civ. P. 50. Accordingly, this claim is reviewable, if at all, only for plain error. Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam). There was no error in this regard, plain or otherwise.

Qualified immunity "protects public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cox v. Hainey, 391 F.3d 25,

-14-

29 (1st Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining whether a public official has violated a clearly established right, a court asks "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).

We already have explained that the plaintiff's theory of the case limns a constitutional violation. Because O'Connor was decided before the events at issue occurred, the right to be free from arbitrary and intentional punishment at the hands of correctional officers was clearly established. See O'Connor, 117 F.3d at 16-17. And certainly, a reasonable correctional officer would have realized that fabricating false charges against a pretrial detainee with the knowledge that the fabrication would lead to immediate segregation was constitutionally impermissible. Cf. Limone, 372 F.3d at 44-45 (declaring it "self-evident" that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit"). It follows inexorably that qualified

immunity was not available to shield Rivas from liability on this count.

      **2.  The Jury Instruction Claim.**  Federal Rule of Civil Procedure 51 prescribes a method for preserving objections to jury instructions.  Under this method, the trial court must inform the parties of its proposed instructions, consider requested instructions, and take objections before charging the jury.  Fed. R. Civ. P. 51(b).  An objection lodged at that time preserves the underlying issue for appeal.  Fed. R. Civ. P. 51(c)(2)(A); see Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 235 (1st Cir. 2005).[3]  If, however, the court fails to proceed as contemplated by Rule 51, a party may object "promptly after learning that the instruction or request will be, or has been, given or refused."  Fed. R. Civ. P. 51(c)(2)(B); see Flynn v. AK Peters, Ltd., 377 F.3d 13, 25 (1st Cir. 2004).  A party's failure to adhere to the protocol specified in Rule 51 constitutes a forfeiture and limits appellate review to plain error.  Fed. R. Civ. P. 51(d)(2).

      In the case at hand, the defendants raised an objection to the wording of the trial court's instructions on count 1 after they were given — but the appellate record is uninformative as to

---

[3]This represents a change from prior procedure.  Under the former version of the rule, effective until December 1, 2003, objections had to be taken at sidebar after the trial judge had charged the jury.  See Fed. R. Civ. P. 51, 28 U.S.C. app. at 779 (2000) (amended 2003); see also Faigin, 184 F.3d at 87.

whether the court conferred with counsel and sought objections prior to charging the jury.  Ordinarily, a gap in the appellate record counts against the appealing party.  See Fed. R. App. P. 10(b)(1)(A), (c) (requiring an appellant to procure "transcript of such parts of the proceedings . . . as the appellant considers necessary" or, if no transcript is available, to "prepare a statement . . . of the proceedings from the best available means, including the appellant's recollection"); see also Real v. Hogan, 828 F.2d 58, 60 (1st Cir. 1987) (explaining that "it is the appellant who must bear the brunt of an insufficient record on appeal").  Here, however, the plaintiff does not dispute that Rivas preserved the objection, so we proceed on that assumption.

The district court instructed that jury in pertinent part that:

> [The plaintiff] contends that Mr. Rivas made . . . false accusations knowing and intending that, as a result, Mr. Surprenant would be removed from his cell and transported to the Restricted Housing Unit and would be subjected to punishment there.  He also contends that those consequences did occur . . . . To prove his claim against Mr. Rivas, Mr. Surprenant must prove by a preponderance of the evidence all of the following three elements:
> 1.   Mr. Rivas falsely accused Mr. Surprenant of being part of a group that attempted to assault him and take him hostage;
> 2.   Mr. Rivas made the false accusations for the purpose of subjecting Mr. Surprenant to punishment without a legitimate purpose; and
> 3.   The punishment that Mr. Rivas intended did occur.

-17-

Rivas argues that this instruction misstates the law.  Thus, our review is plenary.  See, e.g., United States v. Barnes, 251 F.3d 251, 259 (1st Cir. 2001).

We reject Rivas's challenge.  As given, the instruction accurately depicts the elements of a claim of arbitrary punishment of a pretrial detainee through a proxy.  See, e.g., O'Connor, 117 F.3d at 16.  Nothing more need be said.  See Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 135 (1st Cir. 1997) (holding that there is no legal error when the court's instruction "adequately illuminate[s] the law applicable to the controlling issues") (internal quotation marks omitted).

B.  **Count 4:  Violation of Due Process by Spoliation of Disciplinary Proceeding (Pendleton)**.

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court set forth the due process requirements associated with prison disciplinary hearings.  Those requirements include written notice of the charges at least twenty-four hours in advance of the hearing, id. at 564, and the ability to call witnesses and present documentary evidence, id. at 566.[4]  The Wolff Court also implied the obvious:  that the essence of a fair hearing is an impartial decisionmaker.  Id. at 570-71.

---

[4]These requirements may be relaxed in cases in which adherence to them would be "unduly hazardous to institutional safety or correctional goals."  Wolff, 418 U.S. at 566.  The defendants do not contend that any such hazard existed here.

-18-

The lower court's instructions on this point stated that the absence of any one of these protections could constitute a due process violation. Pendleton did not challenge that instruction in the court below. The instruction has, therefore, become the law of the case. See Milone v. Moceri Family, Inc., 847 F.2d 35, 38-39 (1st Cir. 1988).

Although Pendleton's appellate brief is equally silent on the point, her counsel claimed during oral argument in this court that the decision in Sandin v. Connor, 515 U.S. 472 (1995), rendered nugatory the rights enumerated in Wolff. This newly minted argument is likely waived. See, e.g., Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990) (noting that arguments not raised in an appellant's brief are waived, even though urged at oral argument). At best, it is forfeited. See Chestnut, 305 F.3d at 20. We need not dwell on such niceties, however, because Sandin, taken at face value, is of no help to Pendleton.

In Sandin, the Supreme Court explained that prison regulations creating procedures that were to be followed before taking away an inmate's ordinary privileges do not afford the inmate a liberty interest in avoiding the loss of those privileges unless such a loss will result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-84. The Court held that a thirty-day period of punitive segregation, imposed on a convict, did not

-19-

constitute such a hardship and, thus, could be levied without the punctilio that due process otherwise might require. Id. at 485-86. That was so because such "[d]iscipline by prison officials in response to . . . misconduct falls within the expected perimeters of the sentence imposed by a court of law." Id. at 485 (emphasis supplied).

As the underscored language makes plain, the Sandin Court's rationale applies only to those convicted of crimes — not to pretrial detainees. The courts of appeals that have addressed this question are consentient on the point. See Benjamin v. Fraser, 264 F.3d 175, 189 (2d Cir. 2001); Rapier v. Harris, 172 F.3d 999, 1004-05 (7th Cir. 1999); Mitchell v. Dupnik, 75 F.3d 517, 523-25 (9th Cir. 1996); see also Fuentes v. Wagner, 206 F.3d 335, 342 n.9 (3d Cir. 2000) (noting, in dictum, that the Sandin Court's analysis is inapplicable to pretrial detainees). We share that view. Pretrial detainees, unlike convicts, have a liberty interest in avoiding punishment — an interest that derives from the Constitution itself. See Sandin, 515 U.S. at 484 (citing Bell, 441 U.S. at 535, for the proposition that a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law"). Because the plaintiff in this case was a pretrial detainee at and prior to the time of the accusation and the hearing, Sandin is inapposite.

Pendleton raises — or, better put, attempts to raise — two additional challenges. First, she asserts that the evidence was insufficient to establish that she violated the plaintiff's procedural due process rights. Second, she posits that she was entitled to qualified immunity. Like Rivas, however, she failed either to make a motion for judgment as a matter of law at the close of all the evidence or to raise the qualified immunity defense by a timely motion. Given these lapses, the standard of review, described in Part II(A)(1), supra, proves fatal to her claims.

We begin with a procedural point. In this circuit, when a jury in a civil case is presented with multiple theories of liability on a single claim and returns a general verdict for the plaintiff, there ordinarily must be sufficient evidence presented to the jury to support each of the underlying theories (subject, however, to a generous harmless error standard). Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 30 (1st Cir. 2004). In this case, however, Pendleton did not make either a timely motion for judgment as a matter of law or a motion for a new trial; the district court's instruction that proof of any one such violation would suffice to prove the claim has become the law of the case; and Pendleton has failed to raise the "multiple theory" point in this court, instead choosing to make an all-or-nothing argument that the verdict must be discarded because there is insufficient

evidence to support it on <u>any</u> theory.  Given these tactical choices, we need only inquire whether at least one of the theories has some record support.

The record contains enough evidence to allow a rational jury to find that Pendleton was not an impartial decisionmaker. This compendium includes her own testimony that she declined to interview an alibi witness based on her preconceived (and wholly subjective) belief that the witness would lie and her rush to impose sanctions despite having been asked by prison officials to withhold judgment until they had completed a parallel internal investigation into the July 14 incident.  Given this evidence, upholding the verdict on count 4 does not work a clear and gross injustice.  <u>See</u> <u>Faigin</u>, 184 F.3d at 76; <u>La Amiga del Pueblo</u>, 937 F.2d at 691.

In the same vein, the district court did not plainly err in failing, sua sponte, to grant Pendleton qualified immunity. <u>Wolff</u> has long established the level of due process required before a pretrial detainee can be deprived of a liberty interest in a disciplinary hearing, <u>see</u> 418 U.S. at 564-71, and, thus, the procedural due process rights asserted by the plaintiff were clearly established in 2002.  <u>See</u> <u>Collazo-Leon</u>, 51 F.3d at 319 (holding that pretrial detainees must receive disciplinary hearings comporting with due process); <u>see</u> <u>also</u> <u>Benjamin</u>, 264 F.3d at 189-90 (holding that "the procedures required by <u>Wolff</u> apply if the

restraint on [a pretrial detainee's] liberty is imposed for disciplinary reasons"); Mitchell, 75 F.3d at 525 (similar).

The next step must recognize the fact that, unlike in most qualified immunity cases, the jury has spoken here. When evaluating a qualified immunity defense after a trial, an inquiring court must accept the jury's supportable resolution of contested facts. See Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st Cir. 2003); Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999). In this instance, that principle leads us to conclude that Pendleton acted in contravention of the plaintiff's clearly established rights to an impartial decisionmaker. And, moreover, we think it self-evident that any reasonable officer in Pendleton's position would have understood that prejudging alibi witnesses without even interviewing them or hearing their testimony and rushing to impose sanctions before an internal investigation could be completed constituted a course of action inconsistent with the proper role of an impartial adjudicator. Cf. King v. Higgins, 702 F.2d 18, 20-21 (1st Cir. 1983) (rejecting assertion of qualified immunity by officer overseeing prison hearing reminiscent of "kangaroo court" and noting that some aspects of fundamental fairness are so elemental as to "need[] no specific judicial articulation").

For these reasons, we conclude that there was no plain error in the district court's failure, sua sponte, to terminate the case against Pendleton on qualified immunity grounds.

-23-

## C. **Count 6: Conditions of Confinement (O'Mara)**.

A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests. The parameters of such an interest are coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment. See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002). In order to establish a constitutional violation, a plaintiff's claim must meet both objective and subjective criteria. Farmer v. Brennan, 511 U.S. 825, 834 (1994). First, the plaintiff must establish that, from an objective standpoint, the conditions of his confinement deny him the minimal measure of necessities required for civilized living. Id. Second, the plaintiff must show that, from a subjective standpoint, the defendant was deliberately indifferent to inmate health or safety.[5] Id. Deliberate indifference, in this sense, is a mental state akin to criminal recklessness. Id. at 836-37.

Here, the plaintiff sued Superintendent O'Mara in his official capacity. A suit against a public official in his official capacity is a suit against the governmental entity itself. Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 58 n.1 (1st

---

[5]This requirement is a direct consequence of the Eighth Amendment's bar on cruel and unusual punishment; only a condition that can be conceived as being "deliberately administered for a penal or disciplinary purpose" can constitute punishment. Wilson v. Seiter, 501 U.S. 294, 300 (1991) (quoting Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973) (Friendly, J.))

Cir. 2003); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993). The claim against O'Mara is, therefore, a claim against the county (which operates the jail).

In order to hold the county liable, the plaintiff must prove a constitutional violation resulting from a "policy statement, ordinance, regulation or decision officially adopted and promulgated by" those in charge of the jail. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). A custom or practice may suffice to show such a policy if it is so widespread or pervasive that the policymakers must have had actual or constructive notice of it, yet did nothing to modify it.[6] Wood, 354 F.3d at 64.

O'Mara attempts to contest the jury's verdict on two main fronts. He claims, first, that the conditions of the plaintiff's confinement, objectively speaking, were not draconian enough to violate the Constitution; and second, that the conditions complained of did not stem from a policy, custom, or practice attributable to the jail itself (and, by extension, the county). He also argues, albeit perfunctorily, that the record contains no

_____

[6]Typically, the liability of a county would also require proof of fault and causation. Thus, a section 1983 plaintiff ordinarily must show that the county, "through its deliberate conduct . . . was the 'moving force' behind the injury alleged." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (emphasis omitted). However, in situations in which the allegation is that the policy at issue itself violates or directs public officers to violate the Constitution, proof of the existence of the policy "necessarily establishes that the [county] acted culpably." Id. at 405. This is such a case.

evidence that he personally exhibited deliberate indifference to the conditions of the plaintiff's confinement. Because none of these claims was properly preserved — like his fellow defendants, O'Mara made no timeous motion either for judgment as a matter of law or for a new trial — the scope of appellate review is circumscribed. See Faigin, 184 F.3d at 76; La Amiga del Pueblo, 937 F.2d at 691.

We start with the conditions of confinement themselves. Although the parties hotly dispute the conditions that actually obtained in Unit 2B, we must view the facts in the light most favorable to the verdict, consistent with record support. See Correa, 69 F.3d at 1188. At a minimum, the evidence supported findings that the plaintiff, while on AH status and three-day rotation, was in around-the-clock segregation, save only for a five-minute shower break every third day; that the prison withheld all hygienic products from him; that he had access to water (including the ability to flush his toilet) only at the discretion of individual prison guards; and that he was subjected daily to multiple strip searches that required him to place his unwashed fingers into his mouth. The case law as to whether any one of these conditions, by itself, might be serious enough to work a constitutional violation is in some disarray. Compare, e.g., DeSpain v. Uphoff, 264 F.3d 965, 974-75 (10th Cir. 2001) (holding that inmate's exposure to bodily waste in inoperative toilets

states an actionable Eighth Amendment claim); <u>Keenan</u> v. <u>Hall</u>, 83 F.3d 1083, 1089-91 (9th Cir. 1996) (holding that denial of all out-of-cell exercise time and denial of personal hygiene items states an Eighth Amendment claim); <u>and</u> <u>Young</u> v. <u>Quinlan</u>, 960 F.2d 351, 363 (3d Cir. 1992) (requiring prisoner to request permission to wash hands, receive toilet paper, or drink water states an Eighth Amendment claim), <u>with</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Copeland</u>, 87 F.3d 265, 269 & n.3 (8th Cir. 1996) (finding no violation when prisoner was confined to cell with overflowed toilet for four days); <u>and</u> <u>Harris</u> v. <u>Fleming</u>, 839 F.2d 1232, 1234-36 (7th Cir. 1988) (holding that prisoner did not state a claim when prison officials denied him exercise time for twenty-eight days, negligently deprived him of toilet paper for five days, and negligently deprived him of soap, toothbrush, and toothpaste for ten days). Here, however, the cited conditions are present in combination, and the scope of review is narrowed by O'Mara's failure properly to preserve his objection. Under those circumstances, we cannot say that the jury verdict finding constitutionally deficient conditions of confinement was a clear and gross injustice. <u>Cf.</u> <u>Rivera Castillo</u> v. <u>Autokirey, Inc.</u>, 379 F.3d 4, 12 (1st Cir. 2004) (explaining that inconclusive nature of available precedents precludes a finding of plain error).

O'Mara also argues that however egregious the conditions of confinement may have been, their duration was so brief that no reasonable jury could find that they violated the Constitution. We

agree that duration may affect the Eighth Amendment calculus. See Hutto v. Finney, 437 U.S. 678, 687 (1978) (noting that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks and months"). In this case, however, the period of pre-hearing confinement — approximately three weeks — is not so brief as to alter our conclusion.

O'Mara's claim that the record contains no evidence to show that he himself was deliberately indifferent to the conditions of the plaintiff's confinement is a red herring. O'Mara, sued in his official capacity, is merely a proxy for the county. See Nereida-Gonzalez, 990 F.2d at 705. The county's liability is contingent on a constitutional violation by any county official acting pursuant to the interdicted policy, custom, or practice. See Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005). Thus, the crucial consideration is whether the evidence allowed the jury to find that any prison official imposed the challenged conditions upon the plaintiff with the requisite scienter, pursuant to a policy, custom, or practice. See Wilson v. Town of Mendon, 294 F.3d 1, 7 (1st Cir. 2002).

The record here contains a sufficient quantum of evidence to ground such a finding. Scienter often will have to be proven by circumstantial evidence. In the context of claims based on conditions of confinement, the Supreme Court has explained that "a factfinder may conclude that a prison official knew of a

-28-

substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842. The conditions of confinement here were apparent to all and their risks were readily evident. Applying the Farmer standard, the jury in this case reasonably could have inferred that the jailers knew that the combination of near-continuous confinement, denial of exercise time, water, and items of personal hygiene, exposure to bodily waste, and forced insertion of inmates' unwashed fingers into their mouths up to five times per day posed an intolerable health and safety hazard.

To be sure, O'Mara challenges the very existence of the interdicted policy, custom, or practice. Proving the existence of a policy, custom, or practice normally entails questions of fact. See Baron, 402 F.3d at 237. Because this claim of error was not properly preserved, we ask only whether any evidence exists to support a finding that the execution of a governmental policy, custom, or practice caused the injury. See Faigin, 184 F.3d at 76; La Amiga del Pueblo, 937 F.2d at 691.

There is ample evidence to undergird a finding that the challenged conditions were imposed pursuant to recognized prison policy, custom, or practice. Captain Dionne's testimony adequately established that water restrictions and the withholding of personal hygiene items were part and parcel of prison policy. The unsanitary searches were largely derivative of this policy and, in any event, the plaintiff testified that senior officers supervised

-29-

the searches and knew of the manner in which they were administered.  Finally, Dionne testified that the three-day rotation and the other restrictions had been in place for "several years."  Although he insisted that inmates on three-day rotation were to be given one hour of out-of-cell recreation time every three days, that claim was belied not only by the inmates' testimony as to the jail's actual practice but also by Dionne's deposition testimony, put before the jury on cross-examination, in which he acknowledged that a three-day rotation inmate's "only time out of his cell is once every three days for a shower."

To say more anent this issue would be to paint the lily. Given the evidence in the record, we discern no clear and gross injustice sufficient to warrant judgment notwithstanding the verdict on count 6.

### D.  **Evidentiary Challenges**.

The defendants' evidentiary challenges are largely undefined.  They consist mainly of vague assertions that the district court too freely admitted the plaintiff's evidence and too hastily rejected their proffers.  They lace these assertions with repeated attacks on the credibility of the plaintiff's witnesses — attacks that are rooted almost exclusively in stereotypes.[7]

---

[7]Throughout their brief, the defendants assert that both the judge and jury erred in failing to give more respect to the testimony of correctional officers than to the testimony of a motley crew of inmates.  Within broad limits, however, such credibility choices are for the factfinder, not for an appellate

-30-

This imprecision is not helpful to the defendants' cause.  See United States v. Parsons, 141 F.3d 386, 390 (1st Cir. 1998) ("It is counsel's job on appeal to mine the record and prove the alleged error, not to offer suggestive hints and leave the rest of the work to a busy court."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace") (internal quotation marks omitted).  Buried in the rhetorical rubble, we discern three evidentiary arguments that are specific enough to warrant consideration.  We briefly address them.

The first two arguments can be considered in tandem.  The defendants maintain that the trial court improperly excluded evidence of a prior bad act by the plaintiff and, in the bargain, improperly allowed testimony by other inmates as to beatings they suffered ancillary to the July 14 incident.  Both of these rulings implicate Federal Rule of Evidence 404(b), reprinted in the margin.[8]  In reviewing such rulings, we first ask "whether the

---

court.  United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000).  There is nothing here that takes this case out of the mine run.

[8]The rule provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

proffered evidence has some special relevance which enables it to shed light on a disputed issue in the case, rather than merely to show a [party's] deplorable character or propensity for wrongdoing." Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001). If such special relevance exists, we then ask whether the probative value of that evidence is substantially outweighed by other considerations. Id. (citing Fed. R. Evid. 403). We ordinarily review the admission or exclusion of Rule 404(b) evidence for abuse of discretion. Id. at 14. That standard obtains here.

The defendants' first complaint is that they were not allowed to introduce evidence that the plaintiff had "converged" on a correctional officer while incarcerated in a Massachusetts prison in 1995 (seven years before the incident at issue here). They argue that such evidence was "clearly probative of [the plaintiff's] intent and plan, that Rivas's reaction was not the result of a mere misunderstanding or accident, and most importantly, that [the plaintiff] was properly identified as one of the perpetrators." Appellants' Br. at 55.

We begin by noting a threshold problem. The source of this "convergence" evidence is apparently a report from the Massachusetts prison — but that report is not in the record and the defendants did not make an independent offer of proof anent the incident. See Fed. R. Evid. 103(a)(2). In the district court, the

_____

Fed. R. Evid. 404(b).

-32-

plaintiff's counsel stated that the report contains only a bare (unproven) allegation and that, in all events, it alleged that the plaintiff played only a "minor role" in the incident. Without either the report itself or a suitably detailed offer of proof, there is no way to contradict this description. Consequently, it would be surpassingly difficult to find that the district court abused its discretion in rejecting the proffered evidence.

At any rate, the evidence was clearly inadmissible for the purposes urged by the defendants. If it were offered to show that Rivas "properly identified" the plaintiff as a "perpetrator" or to show a "plan" on the plaintiff's part, such a use would require the factfinder to draw a propensity inference — the inference being that because the plaintiff "converged" on a correctional officer in 1995, he was likely to do so again in 2002. Rule 404(b) forbids the introduction of evidence for such a purpose. <u>United States</u> v. <u>Ingraham</u>, 832 F.2d 229, 235 (1st Cir. 1987).

The evidence was similarly impuissant to show intent. Prior bad acts may sometimes provide evidence of intent if "one or more similar prior incidents . . . show a pattern of operation that would suggest intent." 2 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence § 404.22[1][a] (2d ed. 2005). That is merely another way of saying that prior bad acts may be admitted as circumstantial evidence of a party's state of mind. <u>See</u> <u>SEC</u> v.

-33-

Happ, 392 F.3d 12, 29-30 (1st Cir. 2004). The defendants do not explain how the plaintiff's state of mind is relevant to the issues in this case — he was either away lifting weights or he was not — let alone how the mere occurrence of the 1995 incident tends to prove a state of mind that would be relevant here.

Finally, the assertion that the plaintiff's alleged prior bad act is relevant to show "absence of mistake or accident" on Rivas's part does not withstand scrutiny. As a general matter, this facet of Rule 404(b) "does not apply unless the opposing party first raises a claim of mistake or accident." DiRico v. City of Quincy, 404 F.3d 464, 468 n.10 (1st Cir. 2005). The ordinary paradigm is that the plaintiff is required to prove the defendant's wrongful intent; the defendant asserts an absence of wrongful intent, instead claiming that he made a mistake or had an accident; and the plaintiff counters by offering evidence of a similar bad act on the defendant's part that tends to show that the defendant's actions were not the product of a mistake or accident. See, e.g., United States v. Donovan, 984 F.2d 507, 512 n.6 (1st Cir. 1993).

Here, however, the prior bad act is not one committed by the defendant and offered by the plaintiff to show that the defendant acted deliberately. Using the plaintiff's prior bad act to show that the defendant did not mistakenly or accidentally identify the plaintiff as one of his attackers is nothing more than a ham-fisted attempt to put lipstick on the propensity pig.

The defendants' challenge to the admission of evidence regarding beatings suffered by other inmates at the hands of guards in the aftermath of the July 14 incident also fails. Two of the six claims heard by the jury (counts 2 and 3) involved allegations of excessive force, viz., that a guard assaulted the plaintiff while transporting him to Unit 2B on July 14, 2002, and that another officer failed to supervise the first. The district court allowed other inmates transported to Unit 2B that night to testify that they also had been assaulted by the guards. This evidence was admitted to show pattern and modus operandi on the part of the transporting guards as to counts 2 and 3.

The defendants dispute that the evidence was relevant at all. They also argue that any probative worth it might have had was substantially outweighed by its prejudicial nature. See Fed. R. Evid. 403. Given the context of the case and the breadth of the district court's discretion, the evidence appears to have been properly admitted. See Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988) ("Only rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.").

Even were we to assume, for argument's sake, that the district court blundered, any error was harmless. To warrant

-35-

reversal, a non-constitutional trial error must have "had a substantial and injurious effect or influence upon the jury's verdict." Gomez v. Rivera Rodriguez, 344 F.3d 103, 118 (1st Cir. 2003). In this instance, it is hard to imagine that the alleged error could have had such an effect; after all, the jury exonerated the correctional officers on the only counts to which the admitted evidence pertained.[9]

The defendants' last remonstrance is that the district court did not allow inquiry into the gang affiliation of one of the plaintiff's witnesses. Although the defendants baldly assert that they had a right to introduce this bit of evidence, they offer no legal authority supporting their position. We could, therefore, simply dismiss the argument as waived. See Muñiz, 373 F.3d at 8 (holding as waived skeletal argument unaccompanied by "citation to any pertinent authority"); Zannino, 895 F.2d at 17 (similar). We prefer, however, to uphold the ruling as within the ambit of the district court's wide discretion. See Package Mach., 865 F.2d at 1340.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment appealed from must be

---

[9]The defendants suggest that this conclusion overlooks the cumulative impact of several witnesses testifying to the point. We dismiss that suggestion as wholly speculative.

**Affirmed**.