# United States Court of Appeals
## For the First Circuit

No. 06-2410

DEBORAH GALARNEAU,

Plaintiff, Appellee,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. William S. Brownell, U.S. Magistrate Judge], and
[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Newman,[*] Circuit Judge,
and Lynch, Circuit Judge.

Evan M. Tager, with whom Andrew Tauber, Mayer, Brown, Rowe &
Maw LLP, James R. Erwin, Pierce Atwood LLP, and Eugene Volokh, UCLA
School of Law, were on brief, for appellant.
Rufus E. Brown, with whom Brown & Burke, Michael A. Nelson,
and Jensen Baird Gardner & Henry, were on brief, for appellee.

October 12, 2007

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  On January 6, 2004, Deborah Galarneau ("Galarneau") was fired from her job as a stockbroker at Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch").  In a form submitted to the National Association of Securities Dealers ("NASD"), Merrill explained that "Ms. Galarneau was terminated after the firm concluded that she had (I) engaged in inappropriate bond trading in one client's account and (II) utilized time and price discretion in the accounts of three clients."  Galarneau brought this action against Merrill Lynch in the United States District Court for the District of Maine, alleging defamation (among other claims).  The jury found in favor of Galarneau, awarding compensatory and punitive damages.  Merrill Lynch moved for judgment as a matter of law, challenging the finding of defamation and the award of special and punitive damages.  The district court denied the motion.  After careful consideration, we affirm the district court's denial with respect to the finding of defamation and the award of special damages, but reverse with respect to the jury's award of punitive damages.

## I.  FACTUAL BACKGROUND

Because Merrill Lynch challenges the sufficiency of the evidence, we recite the facts in the light most favorable to the verdict.  See Wilson v. City of Boston, 421 F.3d 45, 48 n.2 (1st Cir. 2005).  Deborah Galarneau was employed at Merrill Lynch's Portland, Maine branch office from February 1989, when she joined

her husband Preston Galarneau at the firm, until she was terminated on January 6, 2004. Beginning in 1998, the Galarneaus worked as a team called the "Galarneau Group," as allowed by Merrill Lynch. Galarneau was successful as a financial advisor at Merrill Lynch, ranking in the first or second groupings of producing brokers in her office, qualifying for a $100,000 certificate bonus by growing her business by ten percent for ten consecutive years, and earning other recognition awards and trips.

### The Amy Ford Account

Amy Ford became a client of the Galarneau Group in late 2000. Ford was a single woman in her fifties with a portfolio in excess of $2 million, which served as her primary source of income along with other investments not managed by Merrill Lynch. Her portfolio was heavily weighted in nonperforming equities, which Ford had inherited with a low tax basis. Galarneau testified that Ford had a history of spending more than she earned from her investment income. This practice led her to borrow from her investment account and sometimes required her to sell securities to pay off her debt, thereby incurring significant capital gains taxes.

According to Galarneau, she and her husband developed a three-pronged investment plan for Ford's account: first, to rebalance her portfolio to reduce the concentration in legacy stock and increase her investment in fixed income securities (primarily

bonds); second, to generate more income for Ford to live on; and third, to minimize the capital gains taxes that would be incurred from the rebalancing.

Galarneau testified that she and her husband told Ford that this investment plan would require aggressive and active trading, including the use of an investment strategy called "tax advantage bond swap" when the occasions for doing so arose. Tax advantage bond swaps involve selling bonds that have declined in market value (in relation to their cost basis) and using the proceeds of the sale to buy replacement bonds of equivalent or superior investment value. The intended benefit of such a strategy is that the client take tax losses without sacrificing the quality of her investment portfolio. According to Galarneau, in applying this strategy to the Ford account, the Galarneaus expected to use the tax losses to offset any capital gains resulting from the sale of the legacy stock.

The Galarneaus anticipated that the proposed investment plan could be expensive for Ford if she paid commissions on each trade. Galarneau testified that she and her husband advised Ford of the Merrill Lynch Unlimited Advantage ("MLUA") pricing option, a program through which a client could pay a flat annual fee for trading instead of paying commissions on each transaction. According to Galarneau, Ford declined this option and the parties

arranged a discount for the commissions for trading in the Ford account.

### Merrill Lynch's Review of the Trading in the Ford Account

Galarneau testified that at the outset, she and her husband approached Edward Coppola, then the compliance officer for Merrill Lynch's Northern New England Complex, to discuss the investment strategy for the Ford account. At that time, Coppola did not raise any objections to the proposed investment strategy.

The trading in the Ford account in 2001 and 2002 was very active. During that period, the financial markets were "unusually volatile" in part because of the consequences of the terrorist attacks of September 11, 2001 and corporate accounting scandals. According to Galarneau, these conditions provided opportunities for tax advantage bond swaps, but also required trades that would not otherwise have been made. In addition, Ford's personal spending was three times in excess of her investment income.

Such active trading triggered management review within Merrill Lynch. The firm uses a computer-generated monitoring system called Armor review, which automatically notifies the Merrill Lynch compliance officers of accounts with unusually active trading. The Armor alert may be accessed from either a financial advisor's computer or a compliance officer's computer. It provides background information about the targeted account, including a summary of the frequency and dollar value of trades (with links to

data for individual trades), a comparison of the value of trades versus the commissions earned on the account (the "velocity" of trading), and the commissions for the trading.

The first Armor review took place in July 2001. Coppola asked Galarneau for an explanation of the production credits, the performance, and the strategy. Galarneau provided this information, and Coppola signed off on the trading in the account. According to Galarneau, Coppola never indicated that the trading in the Ford account was inappropriate in any way. Before he left the firm, Coppola reviewed the account again in August 2001 and commented that the account had already been reviewed the previous month.

An Armor review was again triggered the next year, in July 2002, when Richard Heller became the new compliance manager for the Portland, Maine office of Merrill Lynch. Pursuant to the review, Heller specifically asked the Galarneaus about the "high velocity" in the Ford account. According to Galarneau, the Galarneaus explained the investment strategy for the Ford account, and Heller approved the trading.

This time, as recommended by Merrill Lynch's Policy Manual, Heller sent an "activity letter" to Ford dated September 10, 2002, drawing her attention to (1) the substantial volume of trading in her account, (2) the relatively high level of costs associated with that trading ($29,042) in relation to her

-6-

portfolio value, and (3) the sizeable level of her margin account[1] ($203,542). In the letter, Heller asked Ford to confirm that the account was being managed in accordance with her investment objectives and offered to meet with her about the account. Ford never responded. According to Galarneau, she and her husband met with Ford to go over the activity letter, at which point Ford indicated that she was satisfied with how the account was being managed.

A fourth Armor review of the Ford account was triggered in November 2002, which again focused on the substantial volume of trading in the account, including the "high turnover" rate of 6.81%, a very high level of trading. The Galarneaus again explained their strategy of taking as many losses as feasible to offset gains from the sale of legacy stock. Heller checked the box on the Armor review form marked "approved," and noted, "Taking losses, margin debt decreasing, Letters sent 9-13-02."

This was the last substantive Armor review of the Ford account. By 2003, the level of trading went down, and most of the margin debt incurred by Ford to accelerate the rebalancing had been paid off.

---

[1] A "margin account" is a brokerage account in which the broker lends her client cash to purchase securities. The loan is collateralized by the client's securities or cash. If the value of the stock drops significantly, the account holder will be required to deposit more cash or sell a portion of the stock.

According to Galarneau, the strategy proved successful: The Ford account earned $101,000 from the fixed income investments purchased for Ford, saved more than $36,000 in tax liability as a result of the bond swap strategy, and (as of the time Galarneau was terminated) increased in value by $65,000.

**The Ford Complaint**

Ford sent Merrill Lynch a letter on June 7, 2003, accusing the Galarneaus and Merrill Lynch of "churning" her account.[2] Ford copied her complaint to the Maine Securities Division, which promptly opened an investigation into Galarneau, her husband, and Merrill Lynch. In response to this investigation, Merrill Lynch's Office of General Counsel ("OGC") became involved, with Kathleen Durning taking line responsibility, supervised by First Vice President and Assistant General Counsel Andrew Kandel.

**Merrill Lynch's Response**

After receiving explanatory materials from Galarneau and consulting with her, Durning responded to the Maine Securities Division's initial inquiry with a letter defending the trading in the Ford account. The letter provided detail about the context of the trading in the Ford account consistent with explanations that Galarneau provided for the Armor reviews. It explained the

---

[2] Specifically, Ford complained that the turnover in her account "is much higher than the experts I have worked with consider reasonable." While acknowledging the need to take tax considerations into account, she stated that "the goal should be taking losses that exist, not creating them."

investment objectives of the account, the trading strategy designed to achieve these objectives, the offer to Ford of the MLUA pricing option, the frequent meetings with Ford to review trading, the difficult market conditions, the rationale for the use of margin to implement a rebalancing of the account, the problems created by Ford's excessive personal spending, and other background to the management of the account.

On August 8, 2003, the Maine Securities Division responded with a letter asking for additional explanations and documents relating to the trading in the Ford account. Four days later, counsel for Ford sent Merrill Lynch a letter accusing the firm and the Galarneaus of "churning" with a "disastrous" account performance, and demanding restitution.

On September 8, 2003, Durning wrote the Maine Securities Division another letter, reviewed in draft by Kandel, in response to the Division's earlier inquiry for more information. In this letter, Durning reaffirmed the key points of her July 2, 2003 letter and provided additional support for the legitimacy of the management of the Ford account.

### Merrill Lynch's Internal Review

Ford's complaint triggered an internal investigation by Merrill Lynch. Pursuant to this investigation, the firm asked Bates Capital Corporation, an outside firm, to provide a report analyzing the trading in the Ford account on a security-by-security

basis (the "Bates report"). For each fixed-income security that had been traded in the Ford account, the Bates report revealed how long the security had been held, whether it was sold at a profit or loss, whether it was subsequently repurchased and resold and, if so, whether at a profit or loss.

Also pursuant to the internal investigation, Merrill Lynch reviewed Galarneau's personnel file. Heller contacted Jack Michaelian, a former manager, asking for personnel information for Galarneau. He received two memoranda about customer concerns with respect to Galarneau's management of their accounts years earlier. Heller also called a number of Galarneau's clients to determine whether she may have exercised "pure discretion" in managing their accounts.[3] From his first round of telephone calls, Heller concluded that Galarneau may have exercised pure discretion in five accounts. Heller sent his findings to Kandel and Scott Gilbert, an attorney in the OGC assigned to the Ford matter.

As part of the internal review, Galarneau was summoned to the Merrill Lynch corporate headquarters in New York City on October 14, 2003 to be interviewed. According to Galarneau,

---

[3] In the securities industry, trading securities without the prior approval of the investor is referred to as taking "pure discretion," and is illegal. Merrill Lynch, as a matter of internal policy, prohibits its brokers from exercising "time and price discretion," which refers to the exercise of discretion as to the exact time and exact price at which a broker executes an order for her client, even with the prior approval of the client. Time and price discretion is not illegal.

-10-

Gilbert showed little interest in the reasons for the individual trades in the Ford account and instead focused primarily on whether she had exercised pure discretion in any of her other accounts. Galarneau denied that she had exercised pure discretion, but admitted that she may have unknowingly violated the policy on time and price discretion on two occasions. Galarneau testified that at the conclusion of the interview, Gilbert told her that Merrill Lynch "hoped that they could reach an agreement with Ford's attorney and the case would be settled, and that normally then the State goes away."

While the internal review was in progress, Merrill Lynch reached a settlement with Ford in early November 2003 for $100,000. The Maine Securities Division investigation, however, remained ongoing. On November 7, 2003, the Maine Securities Division sent Merrill Lynch another letter requesting information about Merrill Lynch's supervision of the Galarneaus and inquiring "whether or not the Galarneaus are still employed by Merrill Lynch."

### Merrill Lynch terminates Deborah Galarneau

Merrill Lynch terminated Galarneau on January 6, 2004. Edward Hocking, Merrill Lynch's Regional Vice President for the Northern New England Complex and Heller's superior, was responsible for the decision. According to Heller, just before meeting with Galarneau, Hocking told Heller that he had conferred with Merrill Lynch's OGC and that the reasons for the decision to terminate

Galarneau were (1) her exercise of time and price discretion; (2) her prior history, as reflected in two personnel memos and "prior warnings";[4] and (3) the judgment she used in trading in the Ford account. Hocking showed Heller notes he would use in the meeting detailing these reasons. Galarneau testified that Hocking gave her these same reasons for the termination. According to Galarneau, no specific reference was made in the meeting to inappropriate trading, excessive trading, or churning.

On the same day Galarneau was terminated, Kandel called the Maine Securities Division investigator to report the termination. Kandel recorded in his notes of the conversation that the Maine Securities Division investigator appreciated being informed, saying that it "will have an impact." The investigator asked Merrill Lynch to confirm the termination in writing. Kandel

---

[4]  Merrill Lynch claims that on at least two occasions before her dismissal, Galarneau's bond trading "had been the object of concern." The firm introduced evidence that in 1998, Galarneau was summoned to a meeting with her office supervisors "to discuss two client complaints, and her trading strategy in regards to bond swaps," and that in 2000, her supervisors warned her not to engage in active bond trading and that Galarneau responded that she would not do so anymore.

According to Galarneau, she was never warned about her trading with respect to bonds. She introduced evidence that the memorandum memorializing the 1998 meeting does not describe a "warning" or criticism of her bond trading generally, and that there is no other memo concerning the 1998 meeting. Galarneau also testified that at the 2000 meeting, Merrill Lynch objected to a specific business plan for bond trading (as opposed to equity trading) for particular clients, but that the firm made no objection to bond trading under other circumstances.

also requested an opportunity to make a submission to the Maine Securities Division to show that Merrill Lynch's supervision of Galarneau was reasonable.

That submission was made through a letter to the Maine Securities Division dated January 28, 2004, which was circulated twice in draft form by Kandel to Gilbert and Durning. The letter stated that the firm's "review of the Ford account indicates that while it is somewhat active, it was also well diversified between fixed income, equities and cash," and that there were additional features of the portfolio and Ford's investment objectives that supported the manner in which the account was managed. The letter continued, "After Ms. Ford's concerns came to light, however, the Firm learned that Galarneau had exercised time and price discretion on occasion in Ms. Ford's account." The letter explained that because time and price discretion is against company policy, "as well as [other reasons], including management's concerns regarding the activity in Ms. Ford's account, the Firm decided in late December that it was necessary to terminate Ms. Galarneau's employment."

### The U-5

On February 6, 2005, nine days after the letter to the Maine Securities Division, Merrill Lynch filed a Uniform Termination Notice for Securities Industry Registration (Form U-5) with the NASD as required by NASD rules whenever a registered

-13-

stockbroker leaves a firm. In the U-5, Merrill Lynch explained the reason for terminating Galarneau as follows: "Ms. Galarneau was terminated after the firm concluded that she had (I) engaged in inappropriate bond trading in one client's account and (II) utilized time and price discretion in the accounts of three clients." This was followed by a statement disclosing that Galarneau disagreed with the firm's conclusions.

After Galarneau was terminated, she unsuccessfully tried to find employment as a stockbroker at Smith Barney, Edward Jones, and Morgan Stanley.

## Proceedings Below

Galarneau brought an eight-count complaint alleging sex discrimination, breach of contract, breach of fiduciary duty, defamation, tortious interference with economic relations, and violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1). Galarneau subsequently withdrew the breach of fiduciary duty and EPA claims. After the district court denied Merrill Lynch's motion for summary judgment, the remaining claims proceeded to trial.

At the close of the plaintiff's evidence, Merrill Lynch moved pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law on all counts. The district court granted the motion with respect to Galarneau's tortious interference claim, but otherwise

denied it. At the close of all evidence, the district court denied Merrill Lynch's renewed motion for judgment as a matter of law. Accordingly, Galarneau's claims for sex discrimination, breach of contract, and defamation were sent to the jury, and her ERISA claim was submitted to the court. The jury rejected Galarneau's discrimination and contract claims, and the court rejected her ERISA claim. The jury found in Galarneau's favor on the defamation claim, awarding Galarneau $850,000 in compensatory damages (of which $775,000 were for lost wages) and $2,100,000 in punitive damages.

Merrill Lynch again moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, for a new trial, pursuant to Fed. R. Civ. P. 59(a). The district court denied both motions. Merrill Lynch appeals that decision on the ground that there was insufficient evidence to support the jury's finding of defamation and its award of compensatory damages and punitive damages. It also challenges the district court's exclusion at trial of correspondence between Galarneau and Merrill Lynch regarding the language in the U-5.

## II. DISCUSSION

### A. The Sufficiency of the Evidence to Support the Defamation Claim

#### 1. Defamation Under Maine Law

To prove defamation under Maine law, a plaintiff must establish that the defendant made a false statement that "lower[ed]

-15-

[her] in the estimation of the community." Ballard v. Wagner, 877 A.2d 1083, 1087 (Me. 2005) (quoting Schoff v. York County, 761 A.2d 869, 871 (Me. 2000)). Accordingly, "truth is an absolute defense to a charge of defamation." Garrett v. Tandy Corp., 295 F.3d 94, 106 (1st Cir. 2002) (applying Maine law).

False statements are defamatory per se if they relate to a profession, occupation, or official station in which the plaintiff was employed. See Saunders v. VanPelt, 497 A.2d 1121, 1124-25 (Me. 1985). In such cases, malice is implied as a matter of law, and a plaintiff may recover a compensatory award without proving special damages. Farrell v. Kramer, 193 A.2d 560, 562 (Me. 1963). Per se defamation may not be actionable, however, if it is privileged. See Bearce v. Bass, 34 A. 411, 413 (Me. 1896). "A conditional privilege against liability for defamation arises in settings where society has an interest in promoting free, but not absolutely unfettered speech." Lester v. Powers, 596 A.2d 65, 69 (Me. 1991).

The parties agree that Merrill Lynch's statement in the U-5 is conditionally privileged under Maine law. While a conditional (or qualified) privilege does not change the actionable quality of words published, it rebuts the inference of malice that is imputed in the absence of the privilege. See Saunders, 497 A.2d at 1124. Where a conditional privilege exists, "liability for defamation attaches only if the person who made the defamatory

-16-

statements loses the privilege [by] abusing it." Lester, 596 A.2d at 69. A conditional privilege may be abused if the defamatory statement is made with reckless disregard as to its falsity. See Cole v. Chandler, 752 A.2d 1189, 1194 (Me. 2000).

## 2. **Standard of Review**

In an appeal from a district court's denial of a motion for judgment as a matter of law, we generally review questions of law de novo. Negrón v. Caleb Brett U.S.A., Inc., 212 F.3d 666, 668 (1st Cir. 2000). In assessing the sufficiency of the evidence to support a jury verdict, we usually ask "whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found in favor of the party that prevailed." Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22 (1st Cir. 2006). But Merrill Lynch asks us to apply the heightened standard of review appropriate for cases raising First Amendment concerns. See Bose Corp. v Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)("[I]n cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964))). We decline to do so, however, because Merrill Lynch failed to argue in the trial court that this case had any First Amendment implications.

In *New York Times* v. *Sullivan*, the Supreme Court for the first time held that the First Amendment limits the reach of state defamation laws. 376 U.S. at 271. Emphasizing that "freedom of expression upon public questions is secured by the First Amendment," id. at 270, the Court held that a public official suing for a libelous publication critical of his official conduct could not recover unless he proved, by clear and convincing evidence, "that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false." Id. at 280-81.

Ten years later, the Court again reviewed a defamation case in light of First Amendment considerations in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974). Noting that the libelous statement at issue was of undoubted public concern, but that, unlike in *New York Times*, the plaintiff was not a public figure, the Court held that the First Amendment protections were reduced. Id. at 343-46. Balancing the states' "strong and legitimate . . . interest in compensating private individuals for injury to reputation" against First Amendment concerns, id. at 348, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher . . . of falsehood injurious to a private individual," id. at 347, but that a state could not allow recovery

-18-

of presumed damages absent a showing of actual malice. Id. at 349-50.

Finally, in Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759-60 (1985), the Court held that where a private figure is suing over a defamatory statement involving private matters, "the role of the Constitution in regulating state libel law is far more limited." Id. at 759. In such cases, a showing of actual malice is not necessary to establish liability or to presume damages. Id.

These cases illustrate that questions of whether and to what extent the First Amendment places limits on state defamation law are not without nuance. To establish that a particular defamation case raises First Amendment concerns, a defendant must show that the purportedly defamatory statement involved either a public official or a matter of public concern, or both. See Ramírez v. Rogers, 540 A.2d 475, 477 (Me. 1988) (finding that First Amendment concerns were not implicated "[b]ecause th[e] case involve[d] a non-media defendant, defaming a private plaintiff concerning a matter that [was] not of public concern"). Only if the defendant succeeds in doing so does the First Amendment impose a special burden on the plaintiff, and even then the specific burden imposed will depend on the circumstances of the case. Once established, it will be the facts underlying that burden that we, as appellate courts, must independently examine to make sure that "the [defamation] judgment does not constitute a forbidden

-19-

intrusion on the field of free expression." New York Times, 376 U.S. at 285; see also Bose, 466 U.S. at 508 ("Hence, in New York Times v. Sullivan, after announcing the constitutional requirement for a finding of 'actual malice' in certain types of defamation actions, it was only natural that we should conduct an independent review of the evidence on the dispositive constitutional issue.").

But Merrill Lynch has never argued, except in this court, that the First Amendment places any limit on Maine's defamation laws. It never argued before the district court that Galarneau was a public figure or that the U-5 statement involved a matter of public concern. Indeed, at trial, it never sought to impose on Galarneau the burden of establishing, by clear and convincing evidence, that Merrill Lynch had acted with "actual malice" in defaming Galarneau, as required by the First Amendment under the conditions set forth in New York Times.[5] Instead, Merrill Lynch relied unwaveringly on Maine common law to establish that Galarneau had the burden of proving falsity and actual malice by a preponderance of the evidence. Accordingly, the jury was never instructed as to the First Amendment's role in the case, if any.[6]

---

[5] Merrill Lynch did argue that Me. Rev. Stat. Ann. tit. 26, § 598, required Galarneau to establish actual malice by clear and convincing proof. The district court rejected that argument.

[6] With respect to the defamation claim, the jury was instructed that

> [i]n order to prevail on the claim for defamation regarding the U-5 filing that Merrill Lynch made,

-20-

As the Maine Supreme Court has noted, the burden imposed on plaintiffs by the First Amendment is distinct from that imposed by Maine common law:

> Discussion of public officials and public figures on matters of public concern, the U.S. Supreme Court has declared, deserves special favor in a democratic society, and thus such discussion is subject to a conditional privilege -- the "First Amendment privilege" -- that can be overcome only by clear and convincing evidence of knowledge or disregard of falsity. We do not require clear and convincing evidence, however, to overcome a conditional privilege that arises at common law and not from the First Amendment.

Lester, 596 A.2d at 69-70 (internal citations omitted). Because Merrill Lynch failed to make a case for a "First Amendment privilege" at trial, and instead relied exclusively on the conditional privilege afforded by Maine common law, it has forfeited the argument that the First Amendment imposes a special burden on Galarneau. See United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, [it] may not unveil it in the court of appeals."). We therefore have no opportunity to apply heightened review. We review the sufficiency of the evidence

---

Plaintiff must prove, by a preponderance of the evidence, that: . . . the defendant knew the communication was false or spoke with reckless disregard as to whether the communication was false -- that is, the defendant entertained a high degree of awareness of probable falsity or serious doubt as to the truth of the statement.

-21-

supporting the jury's verdict as we would normally, asking whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found in favor of the party that prevailed.  See Bisbal-Ramos, 467 F.3d at 22.

On appeal, Merrill Lynch argues that the jury's verdict cannot stand because Galarneau failed to show that its statement was false and malicious, two requirements for liability under Maine's common law of defamation.

### 3. **Falsity**

We begin with the question of falsity.  At trial, Galarneau argued the statement in the U-5 that she had "engaged in inappropriate bond trading in one client's account" was false.  In making this argument, she relied heavily on expert testimony from Gerald Guild, an expert in fixed income securities with forty-five years of experience in the financial services industry.  Guild testified that after examining all the relevant documentation (including the Bates report), he concluded that the trading in the Ford account was appropriate and consistent with the investment objectives of the account.  He testified that in his opinion, Galarneau's trading in the Ford account was neither excessive nor inappropriate "[b]ecause there was a good and sufficient reason for each and every transaction."

In support of her claim that the statement in the U-5 was false, Galarneau also presented evidence of Merrill Lynch's

recognition and approval of the trading in the Ford account. There was testimony and documentary evidence that during the relevant period -- when the trading in the Ford account was most active -- two of Galarneau's supervisors at Merrill Lynch reviewed and approved the management of the Ford account on at least four separate occasions.[7] There was also evidence that, in compliance with Merrill Lynch's policy, when the Armor system triggered a fourth review of the activity in the Ford account, Heller sent Ford an "activity letter" on September 10, 2002; Heller drew Ford's attention to a "substantial volume of trading" in her account and, while noting that "active trading involves special risks," never suggested it improper.

In addition, Galarneau introduced two letters Merrill Lynch sent to the Maine Securities Division on July 2 and September 8, 2003, in response to inquiries regarding the Ford

---

[7] The jury also heard evidence of other systems of review in place at Merrill Lynch. In a letter to the Maine Securities Division, Merrill Lynch explained:

> Merrill Lynch managers reviewed each of the trades in Ms. Ford's account as they occurred. They did so as part of the daily review of the Firm's End-of-Day Reports and 1028 Reports ("1028"), both of which detail all transactions entered in client accounts. The 1028, in addition to listing all daily transactions, provides a synopsis of the client's investment objectives and risk tolerance. (Other information, such as age, net worth, associated accounts, profit and loss, etc.[] are also available to the managers through the Firm's computer system.) The 1028 is an important tool in evaluating the suitability of trades entered in client accounts.

complaint, which characterized the Galarneaus' approach to the trading in the Ford account as "prudent" when viewed in the context of the overall market and economic conditions at the time. Galarneau also presented testimony from the authors of these letters, Andrew Kandel and Kathleen Durning, that they always tell the truth when they communicate with state regulators, and that no one ever told the Maine Securities Division that either letter was inaccurate or misleading.

Finally, Galarneau presented evidence that at the time she was terminated, inappropriate bond trading was not one of the reasons Merrill Lynch provided for the termination. She also introduced a letter from Merrill Lynch to the Maine Securities Division dated January 28, 2004 (after her termination), explaining that Galarneau was fired for violating the firm's time and price discretion policy and because of "management's ongoing concerns regarding [t]he activity in Ms. Ford's account," but also describing the account as only "somewhat active," and noting that "[the Ford account] was . . . well diversified between fixed income, equities and cash."

Merrill Lynch argues that Galarneau's evidence is insufficient to support a finding of falsity because:

> Guild's conclusory opinion is belied by Galarneau's frequent short-term trading in long-term bonds; the purported "approval" of Galarneau's trading was based largely on Galarneau's own reports and was given before the Bates report revealed the

-24-

inappropriateness of her trading; although Hocking did not use the term "inappropriate trading," he did tell Galarneau that she was terminated for exercising "very poor judgment in the Ford account by pursuing the complicated strategy" after having been "warned" of "similar conduct in the past;" and Merrill Lynch's letter to Maine regulators specifically noted that Galarneau had been terminated, inter alia, as a result of "management's ongoing concerns regarding [t]he activity in Ms. Ford's account."

But these are all arguments that the jury heard and apparently rejected. Our task on review is not to weigh the evidence. It is to ask whether, "viewing the evidence in the light most favorable to the verdict," there is sufficient evidence supporting the jury's verdict. Bisbal-Ramos , 467 F.3d at 22. We find that there is.

The expert testimony that Galarneau's trading was appropriate, even if active, is strong evidence that Merrill Lynch's statement on the U-5 Form is false. Merrill Lynch disagrees, focusing on the fact that Galarneau and Guild admitted that the trading in the Ford account was "very active." However, no one contests this fact, mainly because there is no reason to; that trading is "active" does not necessarily mean that it is "inappropriate." This much is clear not only from Guild's testimony, but also from the fact that Merrill Lynch approved of the trading for so long. The very least that may be inferred from the firm's repeated approval of the trading in the Ford account is that there are circumstances in which such activity is warranted.

-25-

As such, that Galarneau and Guild, along with every other witness to have testified at trial, thought that the trading in the Ford account was active does not answer the question of whether it was inappropriate.

The evidence of Merrill Lynch's continuous approval of Galarneau's trading strategy while the account was at its most active, and its defense of that strategy long after the Ford complaint, also support the jury's ultimate conclusion that the U-5 statement is false. Merrill Lynch again disagrees, relying on the fact that, at the time the firm approved the trading in the Ford account, it did not have the benefit of the Bates report. But the jury was free to disregard this explanation in the face of contradictory evidence presented by Galarneau: First, Galarneau presented evidence about the distortive effect of the report. She testified that the report commingled actual securities losses with securities that were not sold, but declined in market value, counting as a "loss" a security that at the (arbitrary) date of the report may have been down, but later increased in value. Galarneau also pointed out that the report failed to take into account $101,000 in income Ford received and $36,000 in tax savings to Ford, as well as the subsequent $65,000 increase in value of securities retained.

Testimony from Galarneau and Guild, as well as from Richard Heller, that particular trades should be viewed in the

context of the overall trading strategy and the market at that time casts further doubt on the importance of the Bates report, which was limited to "when a given security was purchased, the purchase price, when the security was sold, and the sale price." Finally, we are persuaded that the Bates report could not have been the revelation Merrill Lynch claims it was, given that Merrill Lynch defended Galarneau's trading in the Ford account even after the firm received the Bates report in September 2003.

### 4. Malice Necessary to Overcome Conditional Privilege

Having determined that Galarneau presented sufficient evidence to support a jury finding that the U-5 statement was false, we turn to Galarneau's evidence of malice. As noted above, where a statement is conditionally privileged, "liability for defamation attaches only if the person who made the defamatory statements loses the privilege through abusing it." Lester, 596 A.2d at 69. As such, Merrill Lynch will have abused its conditional privilege if it knew the statement it made in the U-5 was false or if it recklessly disregarded its falsity. Id.

Much of the evidence that supports a finding of falsity also supports a finding of malice. Evidence that Merrill Lynch approved the trading as it was taking place and defended the trading after it came under attack supports the jury's conclusion that the firm either knew the statement was false, or recklessly disregarded its falsity. See Rippett v. Bemis, 672 A.2d 82, 87

-27-

(Me. 1996) ("Evidence is sufficient to support a finding of reckless disregard for the truth if it establishes that the maker of a statement had 'a high degree of awareness of probable falsity or serious doubt as to the truth of the statement.'" (quoting Onat v. Penobscot Bay Med. Ctr., 574 A.2d 872, 874 (Me. 1990)).

Because we find there was sufficient evidence to support the jury's finding of defamation, we affirm the district court's denial of Merrill Lynch's motion for judgment as a matter of law.

## B. **Evidence of Special Damages**

In tort law, proof of causation is generally required to sustain an award of special damages.[8] See generally Doe v. Chao, 540 U.S. 614, 621 (2004). Accordingly, the district court instructed the jury that Galarneau had to prove that the defamatory statement "play[ed] a substantial part in bringing about or actually causing the injury or damages; and the injury or damages was a direct result, or a reasonably foreseeable consequence of the act."

Merrill Lynch argues that there was insufficient evidence that Galarneau's lost wages were caused by the defamatory statement

---

[8] Throughout this opinion we use the term "special damages" in accordance with the common-law definition, i.e., "'[g]eneral damages' are compensatory damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated," whereas "'[s]pecial damages' are compensatory damages for a harm other than one for which general damages are given." Restatement (Second) of Torts § 904(1) (1979).

-28-

in the U-5.  Specifically, Merrill Lynch contends that there are other reasons that might explain why Galarneau was not hired by other firms, including the fact that the U-5 indicated that Galarneau engaged in price and time discretion.

However, we see no reason why Galarneau was required to prove special damages in the first place.  "The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication." Gertz, 418 U.S. at 349.  Maine adheres to these traditional rules of defamation law in certain contexts.

Under Maine law, defamatory words relating to "profession, occupation or official station" are libelous per se. See Saunders, 497 A.2d at 1124.  "When [defamation] per se is established, a plaintiff need not prove special damages or malice in order to recover a substantial award."  Marston v. Newavom, 629 A.2d 587, 593 (Me. 1993).  There can be no doubt that the defamatory statement in the U-5 ("Ms. Galarneau was terminated after the firm concluded that she had . . . engaged in inappropriate bond trading in one client's account . . . .") related to Galarneau's profession.  As such, she was entitled to

recover her lost wages without having to prove causation.[9]  See
Farrell v. Kramer, 159 Me. 387, 390 (1963); Saunders, 497 A.2d at
1124-25.  We therefore affirm the district court's denial of
judgment as a matter of law with respect to the award of special
damages on the ground Galarneau was entitled to those damages
without having to show causation.

### C. **Punitive Damages**

Under Maine law, "punitive damages are available based
upon tortious conduct only if the defendant acted with malice."
Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me. 1985).  While we have
already found that sufficient evidence was presented to establish
malice in overcoming the conditional privilege, we must address the
issue anew to determine whether the award of punitive damages was
appropriate.  "Malice" means different things in different
contexts.  As explained above, a plaintiff may satisfy the malice
requirement to overcome a conditional privilege by showing that the
defendant either knew the statement published was false or
published the statement with reckless disregard as to its falsity.
By contrast, to get punitive damages, a plaintiff must show that
the defendant acted with actual ill will toward the plaintiff or in
a manner "so outrageous that malice toward a person injured as a
result of that conduct can be implied."  Tuttle, 494 A.2d at 1361

---

[9]  While recovery of special damages would have been barred were
the statement privileged, the jury found that Merrill Lynch lost
that privilege due to its recklessness.  Bemis, 672 A.2d at 87-88.

-30-

(holding that for purposes of punitive damages, "'implied' or 'legal' malice will not be established by the defendant's mere reckless disregard of the circumstances"). Moreover, in the context of punitive damages, the plaintiff has the burden of proving malice by clear and convincing evidence, not by the preponderance of the evidence standard applicable in establishing common law defamation. Id. As the Maine Supreme Court has noted,

> "[a]lthough malice (in its ordinary sense of ill will or deliberately outrageous misconduct) must be proven by clear and convincing evidence to support an award of punitive damages, this standard of proof has nothing to do with the 'actual malice' -- that is, knowledge or disregard of falsity -- required to overcome a conditional privilege in defamation."

Lester, 596 A.2d at 70 n.8.

We review de novo "the legal question of whether the evidence suffices to justify an award [of punitive damages]." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 81 (1st Cir. 2001). On appeal, Merrill Lynch argues that the evidence presented at trial was insufficient to support the showing of malice necessary for punitive liability. We agree.

In support of her argument that Merrill Lynch acted maliciously, Galarneau contends that "[t]here can be no question on this record that Merrill Lynch knew that the false accusation in the U-5 would almost certainly result in injury to [her]." But even accepting this as true, Maine law requires more where punitive

-31-

damages are concerned: Merrill Lynch's knowledge must have motivated its statement, or its actions must have been so outrageous as to imply malice. See Haworth v. Feigon, 623 A.2d 150, 159 (Me. 1993). There was no evidence that Merrill Lynch made the statement in the U-5 with the intent to deprive Galarneau of a job. And Merrill Lynch's actions in filing the U-5, knowing it "would almost certainly" hinder Galarneau's job prospects, even if established by clear and convincing evidence, is not sufficiently outrageous to warrant punitive damages. See Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 135 (1st Cir. 2000) ("While a jury could find that the alleged misrepresentations were made knowingly or even recklessly, it could not reasonably infer common-law malice as required under Maine law."); Staples, 629 A.2d at 602-04 (finding that employer's conduct in demoting plaintiff and recklessly accusing him of sabotaging computer files after plaintiff criticized employer was insufficient to establish that defendant's conduct was motivated by ill will or so outrageous that malice could be implied); Boivin v. Jones & Vining, Inc., 578 A.2d 187, 188-89 (Me. 1990) (finding that employer's conduct in rehiring employee with promise of employment through retirement, while in fact intending to retain employee only until inventory was reduced, was not so outrageous as to justify award of punitive damages). As such, we find that the evidence presented at trial was insufficient to support an award of punitive damages and therefore reverse the

district court's denial of judgment as a matter of law on this point.

### D. **Evidence Relating to the Drafting of the U-5**

Before trial, Galarneau filed a motion in limine to exclude all evidence of communications between Galarneau's counsel and counsel for Merrill Lynch regarding the opportunity to review and comment upon the language Merrill Lynch proposed to use in Galarneau's Form U-5. Galarneau claimed that evidence of such communications was subject to exclusion under Fed. R. Evid. 408 "because it constitutes an offer and/or communication made during settlement negotiations," or, in the alternative, under Rule 403 because it had "minimal relevance compared to its unfair prejudice." The district court granted the motion to exclude, stating:

> I'm not going to let it in. I'm not changing my previous ruling. In think under 408, 403, and in my discretion in this matter, I think it opens doors that might well require counsel to testify. I think they are settlement discussions.

"[T]he district court's construction of evidentiary rules is a question of law which we review de novo," United States v. Barone, 114 F.3d 1284, 1296 (1st Cir. 1989), while the district court's application of the rule to particular facts is reviewed for abuse of discretion, Blake v. Pellegrino, 329 F.3d 43, 46 (1st Cir. 2003).

-33-

Merrill Lynch argues that the exclusion of this evidence was prejudicial error, and it is therefore entitled to a new trial. We disagree.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The trial court employs a balancing test to determine whether Rule 403 applies, weighing the probative worth of the evidence against its potentially confusing effects. See Fryar v. Curtis, 485 F.3d 179, 184 (1st Cir. 2007). Thus, even where the evidence may shed light on the disputed issues, the district judge can find the "untoward effects of the proffered evidence" to be so weighty that the evidence should be excluded. Faigin v. Kelly, 184 F.3d 67, 80 (1st Cir. 1999).

We "accord district courts considerable latitude in this exercise" and review the exclusion of evidence under Rule 403 for abuse of discretion. Id. at 79-80. The district judge enjoys a unique advantage in observing first-hand the nuances of trial, Faigin, 184 F.3d at 80, we therefore give the district court "significant leeway" in making its determinations, Williams v. Drake, 146 F.3d 44, 47 (1st Cir. 1998). We have consistently declined to reverse the district court's judgment "from the vista

-34-

of a cold appellate record" absent "extraordinarily compelling circumstances."  Faigin, 184 F.3d at 81 (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)); see also Onujiogu v. United States, 817 F.2d 3, 6 (1st Cir. 1987) ("Only in compelling circumstances will we reverse the exercise of a district court's informed discretion concerning the relative weight of probative value and unfairly prejudicial effect.").

We find that the district court did not abuse its discretion in excluding the evidence under Rule 403 in this case. As required under the rule, the district court weighed the probative value of the evidence against the risk of confusion of the issues.  Finding that the evidence was probative of both parties' contentions with respect to liability and that it would likely require testimony from the attorneys as to the motivations behind the proposed U-5 language and Merrill Lynch's refusal to adopt it, the district court excluded the evidence.  Cf. United States v. Angiulo, 897 F.2d 1169, 1194 (1st Cir. 1990) (acknowledging the "advocate-witness rule, which generally bars an attorney from appearing as both an advocate and a witness in the same litigation" (internal quotation marks omitted)).  We find no fault in this determination.  Moreover, Merrill Lynch has not shown, nor has it alleged, any extraordinarily compelling circumstances that would justify our reversal of the district court's ruling.  Rather, they have merely alleged that the district

judge did not give enough weight to the probative value of the evidence.  In light of the unexceptional nature of Merrill Lynch's allegations, we decline to disturb the district court's ruling under Rule 403.[10]

### III. Conclusion

For the reasons stated above, we affirm the district court's denial of Merrill Lynch's motion for judgment as a matter of law with respect to (1) the sufficiency of the evidence supporting the jury's finding of defamation and (2) the award of special damages.  We also affirm the district court's exclusion of evidence.  We reverse, however, the district court's denial of judgment as a matter of law on the punitive damages question and vacate that award.

**Affirmed in part; Reversed and Vacated in part**. **Each party shall bear its own costs.**

---

[10]  Because we find no abuse of discretion in the exclusion of the correspondence under Rule 403, we need not address Merrill Lynch's argument that the evidence was not excludable under Rule 408.